**ALYESKA PIPELINE SERVICE COMPANY, Appellant, Cross-Appellee,**

v.

**Whitten H. ANDERSON and Ronald R. Thomas, Appellees, Cross-Appellants.**

**Nos. 4536, 4539.**

Supreme Court of Alaska.

June 5, 1981.

Charles P. Flynn and Nelson G. Page, Burr, Pease & Kurtz, Inc., Anchorage, for appellant, cross-appellee.

Charles D. Silvey, Jr., Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, and Clyde O. Martz and Howard L. Boigon, Davis, Graham & Stubbs, Denver, Colo., for appellees, cross-appellants.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

RABINOWITZ, Chief Justice.

This appeal is from a jury award for the unlawful taking of slate from the mining claim of Anderson and Thomas (hereinafter Anderson) by Alyeska during the construction of the Trans-Alaska Pipeline System. Alyeska asserts numerous specifications of error concerning the validity of Anderson's mining claim and the propriety of the damages awarded. Anderson cross-appeals from the court's failure to award prejudgment interest, the court's award of attorney's fees, and the court's directed verdict in favor of Alyeska on the issue of punitive damages. We conclude that none of the specifications of error in either the appeal or the cross-appeal have merit and thus affirm the judgment of the superior court.

In 1966, Anderson filed an unpatented mining claim at Mile 34.5 Elliot Highway, just north of Fairbanks. His mining claim is for building stone (green slate) alleged to possess distinct and special value. Ander-

son testified that the physical qualities which give this stone distinct and special value are its easy cleavability, distinctive streaks which permeate the stone, and the presence of fossils.

In 1975, one of Alyeska's subcontractors constructed a pipeline access road across Anderson's mining claim. Anderson discovered this and negotiated a lease for an access road right-of-way at an annual rental of $1,000. The lease contained a covenant against waste.

In 1976, employees of Price, a joint venture subcontractor for Alyeska, removed a quantity of rock for use in the pipeline construction. Wemmer, foreman of the crew that removed the slate, testified that he knew when he was removing the slate that it was not from one of Alyeska's designated materials locations. The designated location in that area was on a steep incline which was difficult to reach; attempts to use it had resulted in serious damage to several trucks. The slate deposit was easily accessible and was well-suited for use as material to support the pipeline structure. Wemmer testified that his supervisor had talked to a representative of the State Department of Highways who was also taking rock from this area and that the state representative had given authorization for taking the rock. Wemmer further testified that Alyeska's subcontractors had previously taken material from state rock sites after obtaining permission from the state. After Wemmer was informed by his supervisors that this rock should not have been taken, he proceeded to remove an additional six truck loads of rock.

Anderson requested payment for the taking of the rock and subsequently filed suit, alleging claims for relief sounding in both tort and contract, for conversion of the rock. The primary disputes at trial centered on two areas. Alyeska contested the validity of Anderson's mining claim, contending that the claim did not encompass a "valuable mineral deposit" as required by 30 U.S.C.A. § 22; Alyeska argued that absent a valid mining claim, Anderson had no right to damages on either a tort or a

contract rationale. The other primary area of contention was the extent of damages incurred, namely the quantity and value of the rock which was removed by Alyeska from Anderson's claim. By special verdict, the jury found that Anderson had "discovered a valuable mineral as defined in the instructions" and awarded Anderson compensatory damages in the amount of $1,911,429.40.

In this appeal Alyeska contends that the superior court's instructions pertaining to the issue of whether Anderson had located a valuable mineral deposit under federal law were inadequate and confusing; that the superior court should have granted its motions for summary judgment, directed verdict, and judgment n.o.v. on the theory that Anderson had failed to establish that he had a valid mining claim; that the trial should have been stayed pending determination by the Bureau of Land Management of the validity of Anderson's mining claim; and that the superior court's instructions allowing a harsh form of trespass-conversion damages were improper. As noted previously, Anderson has cross-appealed, claiming that the superior court should have awarded pre-judgment interest and greater attorney's fees, and that it erred in directing a verdict in Alyeska's favor on the issue of punitive damages.

### I. Instructions Concerning the Validity of Anderson's Mining Claim.

To recover for the removal of the rock, Anderson was required to establish that he had a valid claim to it. Anderson's interest in the subject rock was based on his unpatented mining claim located on federal land. Alyeska, in an attempt to defeat his claim for damages, asserted that Anderson did not establish a valid mining claim.

■■■ To be valid under the provisions of 30 U.S.C.A. § 22, a mining claim must be one for "valuable mineral deposits."[1] Two complementary tests have been developed for determination of whether minerals are valuable: the prudent person test and the marketability test. *See United States v. Coleman*, 390 U.S. 599, 601–03, 88 S.Ct. 1327, 1329–1331, 20 L.Ed.2d 170, 174–75 (1968). These tests "are not distinct standards but are complementary in that the latter is a refinement of the former."[2] *Id.* at 603, 88 S.Ct. at 1330, 20 L.Ed.2d at 175. Basically, the prudent person test requires that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine."[3] The marketability test requires that "it must be shown that the mineral can

---

1. 30 U.S.C.A. § 22 (West 1971) provides:
   Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.
   The Supreme Court, in *United States v. Coleman*, 390 U.S. 599, 600 n.1, 88 S.Ct. 1327, 1329 n.1, 20 L.Ed.2d 170, 173 n.1 (1968), noted:
   The cornerstone of federal legislation dealing with mineral lands is the Act of May 10, 1872, 17 Stat. 91, 30 U.S.C. § 22, which provides in § 1 that citizens may enter and explore the public domain and, if they find 'valuable mineral deposits,' may obtain title to the land on which such deposits are located by application to the Department of the

Interior. The Secretary of the Interior is 'charged with seeing ... that valid claims ... [are] recognized, invalid ones eliminated, and the rights of the public preserved.' *Cameron v. United States*, 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659, 662.
For the law of discovery, *see generally* Reeves, *The Law of Discovery Since Coleman*, 21 Rocky Mtn. Mineral Law Inst. 415 (1976); Reeves, *The Origin and Development of the Rules of Discovery*, 8 Land & Water L.Rev. 1 (1973).

2. For problems involved in applying these two tests with one viewed merely as a refinement of the other, *see* 1 American Law of Mining § 4.82 (1980); Reeves, *The Law of Discovery since Coleman*, 21 Rocky Mtn. Mineral Law Inst. 415, 438–41 (1976).

3. *United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170, 174 (1968) (citation omitted).

be 'extracted, removed and marketed at a profit.' " [4]

In addition to the foregoing, since the only claimed use for the slate found in Anderson's claim is as building stone, it also comes under the Common Varieties Act, 30 U.S.C.A. § 611 (West 1971).[5] This act provides that:

No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: *Provided, however*, That nothing herein shall affect the validity of any mining location based upon discovery of some other mineral occurring in or in association with such a deposit. 'Common varieties' as used in sections 601, 603, and 611 to 615 of this title does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value .... [emphasis in original] [6]

The Supreme Court, in *United States v. Coleman*, 390 U.S. 599, 605, 88 S.Ct. 1327, 1331, 20 L.Ed.2d 170, 176 (1968), determined from the legislative history of 30 U.S.C.A. § 611 that building stone was intended to be included within this section:

[W]e read 30 U.S.C. § 611, passed in 1955, as removing from the coverage of the mining laws 'common varieties' of building stone, but leaving 30 U.S.C. § 161, the 1892 Act, entirely effective as to building stone that has 'some property giving it distinct and special value' ....

Thus, besides satisfying the marketability and prudent person tests, Anderson had the further burden of proving that the slate located in his claim had "distinct and special value." [7]

---

**4.** *United States v. Coleman*, 390 U.S. 599, 600, 88 S.Ct. 1327, 1329, 20 L.Ed.2d 170, 173 (1968) (citation omitted). *See generally* Lacy, *Present Marketability: A Proper Test of Mineral Value Under the Mining Law?*, 9 Ariz.L.Rev. 70 (1967).

**5.** On appeal, Anderson contends for the first time that slate is not a common building material and thus that the Common Varieties Act is inapplicable. Given our affirmance of the finding that the material in issue had "distinct and special value," we need not address this contention.

**6.** 43 C.F.R. § 3711.1(b) (1979), implementing 30 U.S.C.A. § 611, provides:

(b) 'Common varieties' includes deposits which, although they may have value for use in trade, manufacture, the sciences, or in the mechanical or ornamental arts, do not possess a distinct, special economic value for such use over and above the normal uses of the general run of such deposits. Mineral materials which occur commonly shall not be deemed to be 'common varieties' if a particular deposit has distinct and special properties making it commercially valuable for use in a manufacturing, industrial, or processing operation. In the determination of commercial value, such factors may be considered as quality and quantity of the deposit, geographical location, proximity to market or point of utilization, accessibility to transportation, requirements for reasonable reserves consistent with usual industry practices to serve existing or proposed manufacturing, industrial, or processing facilities, and feasible methods for mining and removal of the material. Limestone suitable for use in the production of cement, metallurgical or chemical grade limestone, gypsum, and the like are not 'common varieties.' This subsection does not relieve a claimant from any requirements of the mining laws.

**7.** The question of whether a material possessed distinct and special value was considered in some detail in *United States v. U.S. Minerals Development Corp.*, 75 Interior Dec. 127 (1968). In *U.S. Minerals*, the stone in question was a reddish quartzite used for veneer on walls and for fireplaces and patio floors. That decision sets forth the relevant test in this area as interpreted by the Department of the Interior:

In short, the Department interprets the 1955 act as requiring an uncommon variety of sand, stone, etc. to meet two criteria: (1) that the deposit have a unique property, and (2) that the unique property give the deposit a distinct and special value. Possession of a unique property alone is not sufficient. It must give the deposit a distinct and special value. The value may be for some use to which ordinary varieties of the mineral cannot be put, or it may be for uses to which ordinary varieties of the mineral can be or are put; however, in the latter case, the deposit must have some distinct and special value for such use. For example, suppose a deposit of gravel is found which has magnet-

■ Regarding these tests, the superior court instructed that:

> Federal lands, unless otherwise appropriated, are open for entry and location of mining claims only as to valuable mineral deposits. The term 'valuable mineral deposits' has a special meaning with respect to the type of material involved in this law suit. In order for the material involved in this law suit to be classified as a 'valuable mineral deposit' it must have a distinct and special value.

In our view this instruction adequately described the relevant portion of 30 U.S.C.A. § 22.[8] The instruction also expressed the superior court's recognition that slate is a "common variety" mineral and that thus it must possess a "distinct or special value" to be the basis of a valid mining claim.

■ The superior court further instructed that:

> ic properties. If the gravel can be used for some purpose in which its magnetic properties are utilized, it would be classed as an uncommon variety. But if the gravel has no special use because of its magnetic properties and the gravel has no uses other than those to which ordinary nonmagnetic gravel is put, for example, in manufacturing concrete, then it is not an uncommon variety because its unique property gives it no special and distinct value for those uses.
>
> The question is presented as to what is meant by special and distinct value. If a deposit of gravel is claimed to be an uncommon variety but it is used only for the same purposes as ordinary gravel, how is it to be determined whether the deposit in question has a distinct and special value? The only reasonably practical criterion would appear to be whether the material from the deposit commands a higher price in the market place. If the gravel has a unique characteristic but is used only in making concrete and no one is willing to pay more for it than for ordinary gravel, it would be difficult to say that the material has a special and distinct value.
>
> . . . .
>
> When the same classes of minerals used for the same purposes are being compared, about the only practical factor for determining whether one deposit of material has a special and distinct value because of some property is to ascertain the price at which it is sold in comparison with the price for which the material in other deposits without such property is sold.

> In demonstrating that the type of material involved in this law suit has some special and distinct economic value, the plaintiff must show either (1) a unique quality which permits a use for the mineral for which other materials may not be used; or (2) if uses are the same, that some unique quality gives the mineral an economic advantage over competing stone, reflected either in higher price for the stone in question, or alternatively, in lower production costs. That is, the alleged unique quality must result in an economic advantage. In applying the foregoing standards, the inquiry is not limited to deposits of identical stone. Rather, inquiry is made to the availability and price of competing materials used for the same purposes.

This instruction correctly defines the term "distinct and special value." Further, the court gave the following instruction:

> With these principles in mind we turn to a consideration of the facts in this case. The special properties claimed for the Rosado stone are its reddish color and luster and its easy cleavability. The stone is a quartzite, i. e., a metamorphosed sandstone. The evidence indicates that the nearest similar deposit of quartzite is 14 or 15 miles away, although one of appellant's officers testified that it was not of the same quality. As noted earlier, the stone has been sold and used in a variety of building construction, as veneer in walls, in fireplaces and hearths, and in patio floors. Two stonemasons testified for the appellant that people like the color of the Rosado stone and that it was good to work with. However, it was not used for any purpose that other decorative building stone is not used for.
>
> Since no unique use is claimed for the stone and it is used only for the same purposes as any decorative building stone, the question is whether the special properties of the stone, color and cleavability, give it a special and distinct value for such uses. That is, does it command a higher price than other decorative building stone in the area?

*Id.* at 134–35 (citations omitted).

The *U.S. Mineral* position was accepted in *McClarty v. Secretary of the Interior*, 408 F.2d 907, 908–09 (9th Cir. 1969), with the qualification that value could be shown not only by a higher price but also by increased profits for a competitive price.

8. *See* note 1 *supra.*

In determining whether a deposit constitutes a valuable mineral deposit, two basic tests are utilized. First, there is the marketability test, which requires that a mineral be shown to be marketable at a profit, and moreover marketable at a profit comparable to that obtained by persons marketing competing materials. Secondly, there is a more generalized 'prudent-man test': that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine. Factors relevant to the foregoing considerations include (1) availability of other sources of material to meet market demand; (2) proximity of the material in question to market; (3) quality and quantity of the deposit; (4) accessibility of the deposit; (5) price and cost factors; and (6) actual utilization of the deposit.

We believe this instruction fairly summarized the prudent man and marketability tests.

▪ It is to these three instructions that Alyeska took exception on the grounds that they were incomplete and misleading. The claim that the instructions were misleading is based on the contention that the instructions failed to make clear that the "distinct and special value" test was separate from the marketability and prudent person tests. Alyeska further argues that these instructions gave the jury the impression that it was necessary to satisfy only one general test, rather than several distinct tests.

Alyeska made appropriate objections before the superior court and requested that its proposed instruction no. 3, describing the marketability and prudent person tests, be given instead of the instruction quoted above. Alyeska's proposed instruction was virtually identical to the one given by the superior court except for the addition of a prefatory sentence which reads: "In addition to a demonstration of economic advantage over competing stone, plaintiffs bear the burden of meeting two further basic tests."

We are of the view that the court's three instructions adequately informed the jury of the fact that the tests were separate. Considering the circumstances under which the instructions were given and their probable effect on the jury, we are convinced that failure to give this additional clarifying sentence did not result in jury confusion and, thus, that it did not affect Alyeska's substantial rights.[9]

▪ Alyeska's other assertion of error concerning these instructions is that they were inadequate. It is claimed that the superior court's instructions failed to set forth relevant factors pertaining to the "distinct and special value" test and to make clear that certain other factors were to be excluded.

The first half of Alyeska's proposed instruction states that a finding of uniqueness must be based on factors beyond the fact that the material commands a higher price, or is subject to lower production costs, than competing decorative stone.[10]

9. Alaska R.Civ.P. 61 provides:
   No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
   See also Martinez v. Bullock, 535 P.2d 1200, 1206 (Alaska 1975).

10. Alyeska's proposed instruction no. 2 read:
   If you find that the material does command a price higher than or production costs lower than that for competing decorative building stone, you must then consider other factors in determining whether the stone may be said to be sufficiently unique to be subject to valid location under federal mining law. In the facts of this case, you must consider whether and to what extent there are deposits of stone similar to the stone involved in the current case in relevant areas of Alaska. That is, if the deposit is but one of several deposits in the area, it cannot be said to be unique within the meaning of federal law. Similarly, the lack of substantial sales of the stone, where a claim has been held for some time, is relevant to the issue of uniqueness.

According to Alyeska, the existence of abundant nearby deposits of identical stone without distinguishing features would negate uniqueness. In *United States v. Heden*, 19 IBLA 326, 339 (1975), it was held that "in comparison with the extremely large deposits of similar stone throughout the area, the stone herein concerned is not unique." Although the legal basis for Alyeska's proposed instruction is undeniable, there was not a sufficient factual basis to support the giving of the instruction in this case. No testimony was given that reflected that green slate was actually available anywhere else in the Fairbanks area for use as a building stone or that any had been placed on the Fairbanks building stone market. Thus, we find no error in the superior court's failure to give this portion of Alyeska's proposed instruction.

The second half of Alyeska's proposed instruction enumerates certain relevant and irrelevant factors regarding the uniqueness test. First, Alyeska asserts that the lack of a history of substantial sales tends to negate uniqueness. The question, as articulated in *U. S. Minerals* and *McClarty*,[11] is whether the subject green slate with its claimed properties of color and cleavability commands a higher price in the market or involves lower production costs than competing stone. Alyeska argues that it is therefore proper to consider anything which reflects on whether the green slate commands a higher price or otherwise offers a

profit advantage. We think the jury should have been instructed that it could consider the sales history of this material in relation to the distinct and special value test and that the court erred in failing to so instruct. But, as discussed below, we are of the further view that the court's omission was harmless error.

Alyeska's proposed instruction also would have informed the jury factors such as location, accessibility, and proximity of the rock to market are irrelevant because "uniqueness" is dependent on the "inherent physical characteristics of the material in question."[12] In determining whether the green slate in issue generates greater profits than other building stone in the Fairbanks area, however, production costs must be considered. Location, accessibility, and proximity to market are relevant to a determination of whether the mineral possesses characteristics that make it more valuable than competing materials.[13] Thus, this portion of the proposed instruction is an incorrect statement of the law and was properly rejected by the superior court.

Finally, Alyeska's proposed instruction states that determination of the market for the stone must be made on the date of discovery of the mineral rather than at a subsequent time. This is a correct statement of law as to the test of marketability.[14] However, it is not clear that this requirement also applies to the uniqueness

That is, if only limited and sporadic sales have occurred, such a factor tends to negate claims that the rock possesses a special and distinct value which was marketable as of the date of discovery. Factors which are not relevant and which should not be considered on the issue of uniqueness include location, accessibility, or proximity of the rock to market. That is, the distinctive qualities referred to in federal law relate to inherent physical characteristics of the material in question, and not to external factors such as proximity to market. Claims of uniqueness may also not be based upon speculation as to future prices or the availability of a market at a future date. That is, marketability of the stone as a result of alleged unique qualities must be established as of the date of the alleged discovery Locations of mining claims based on speculation that there may

at some future date be a market for the discovered materials are not allowed.

11. *See* note 7 *supra*.

12. *See, e. g., United States v. Heden*, 19 IBLA 326, 341 (1975).

13. 43 CFR § 3711.1(b) (1979) provides in part: In the determination of commercial value [for a finding of distinct and special properties of a common variety mineral], such factors may be considered as quality and quantity of the deposit, geographical location, proximity to market or point of utilization, [and] accessibility to transportation . . . .

14. In *Hallenbeck v. Kleppe*, 590 F.2d 852, 859 (10th Cir. 1979), the court held: We feel the court correctly followed the test of present marketability. See, *e. g., Cole-*

test. In any event, because we believe that the superior court's instruction on the marketability test was adequate in this respect, we perceive no need to consider the issue in the context of the uniqueness test. We conclude that the superior court's omission of this portion of Alyeska's instruction was not error.

▮ Thus, the only portion of Alyeska's proposed instruction which should have been given is that which related to the evidence of sales history. The jury was instructed to consider the "actual utilization" of the claim and other relevant factors and was fully apprised of the limited sales Anderson had made of the mineral as well as other information relevant to the question of marketability. While an additional instruction further setting forth relevant methods of determining marketability would have been helpful, we cannot conclude that its omission affected substantial rights of Alyeska. We therefore find that any error in the superior court's instructions to the jury was harmless.

man, supra, 390 U.S. [599] at 602–03, 88 S.Ct. 1327 [1330–1331]; *Barrows v. Hickel*, 447 F.2d 80, 83 (9th Cir.). The court's findings in the instant case stated that: 'A private litigant cannot locate public claims upon public lands and then simply wait until the minerals are in sufficient demand to be marketed at a profit,' and also that: '. . . plaintiffs cannot hoard common sand and gravel on public lands until it becomes profitable to market such deposits.' The court also quoted the following statement from the opinion in *Foster v. Seaton*, 106 U.S.App.D.C. 253, 255, 271 F.2d 836, 838:

To allow such land to be removed from the public domain because unforeseeable developments might some day make the deposit commercially feasible can hardly implement the congressional purpose in encouraging mineral development.

We feel that the district court did not err, and instead properly followed the marketability test. It is required that there be, at the time of discovery, a market for the discovered material that is sufficiently profitable to attract the efforts of a person of ordinary prudence. *Barrows v. Hickel*, 447 F.2d 80, 83 (9th Cir.). The question of marketability is one of fact. The absence of proof of actual sales of material from the claims is relevant but not conclusive and may be overcome by other evidence of marketability. *Melluzzo v. Morton*, 534 F.2d 860, 863 (9th Cir.). The

## II. Superior Court's Refusal to Determine Factual Issues.

As its second specification of error Alyeska contends that Anderson presented insufficient evidence to demonstrate a valid mining claim upon which he could maintain claims for relief. Alyeska therefore argues that the superior court should have granted its motions for summary judgment or directed verdict, or ordered a judgment n. o. v. It is abundantly clear that the validity of Anderson's mining claim is an issue of fact and that Alyeska's motion for summary judgment was correctly denied since there existed material issues of fact regarding the validity of the claim. *See Wickwire v. McFadden*, 576 P.2d 986, 987 (Alaska 1978). But a determination of the correctness of the superior court's refusal to direct a verdict or enter a judgment n. o. v. requires that we review the evidence as it relates to the applicable tests we have previously discussed.[15]

evidence of lack of sales from the claims was relevant and we find no error in the ruling by the district court that the record supports the Board's findings.

**15.** *As to the directed verdict, the appropriate standards for review were discussed at length in Teller v. Anchorage Asphalt Paving Co., 545 P.2d 177, 180 (Alaska 1976), quoting Holiday Inns of America, Inc. v. Peck, 520 P.2d 87, 92 (Alaska 1974) (footnotes omitted), in which we stated:*

In reviewing a lower court's rulings pertaining to motions for directed verdict we are required to view the evidence in the light most favorable to the non-moving party, and to afford him the benefit of all inferences which the evidence fairly supports. Moreover,

It is well established that the proper role of this court, on review of motions for directed verdict . . ., is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.

In such cases the appellate court applies an objective test and if there is room for diversity of opinion among reasonable people, then the question is one for the jury to decide. In other words, a jury question, or question of

The first question is whether the green slate located in Anderson's claim has distinct and special value, and is thus outside the ambit of the Common Varieties Act. The alleged inherent special qualities of this rock are almost identical to those asserted in *U. S. Minerals*.[16] The question of whether the rock in Anderson's claim is distinct and special therefore turns upon whether it commands a higher price or yields higher profits than other decorative building stone available in the Fairbanks market. The marketability and prudent person tests require, in addition to that determination, that at the time of discovery a prudent person would have been justified in developing the mine and would have had a reasonable prospect of financial success in the venture. The contested factual questions relevant to these tests center on whether there was a market for Anderson's slate.

The record shows that Jack Pruitt, a local stone mason, had used some of Anderson's rock in the construction of a church in Fairbanks prior to the filing of Anderson's claim. The two claim owners, Anderson and Thomas, had also used the stone to build fireplaces for their homes, and Thomas had covered the front of his house with the stone shortly after the claim was filed in 1966. In 1967 or 1968 Anderson sold five or six tons of stone at a price of $80 per ton to the Fox Roadhouse. This sale resulted in a total profit of approximately $160. Apparently acting without knowledge of Anderson's claim, Warren Stearns, another local stone mason, quarried five tons of rock for his own fireplace during this period. Anderson also placed several tons of stone on consignment with Fairbanks Sand and Gravel. At the time of trial, Fairbanks Sand and Gravel had sold less than two tons

of the stone at $85 per ton, for which Anderson received $50 per ton. Additionally, there was a sale made to Wally Burnett in the summer of 1978 of approximately twenty-six tons; Burnett extracted the stone himself and paid Anderson $40 per ton.

As Alyeska repeatedly observes, the only marketing of the slate in the first ten years of Anderson's claim was one sale of five to six tons which resulted in a profit of approximately $160. Alyeska points to this single sale as suggesting that there is no market for the slate. Alyeska also notes that at Fairbanks Sand and Gravel, the only Fairbanks retail outlet for building stone, Anderson's slate sells for $85 per ton while Fox marble sells for $100 to $150 per ton and Shaw Creek rock sells for $120 per ton. Alyeska argues that Anderson's slate does not possess special and distinct features since it is used only for building stone and fails to command a higher price than competing stone.

However, as *McClarty v. Secretary of Interior*, 408 F.2d 907, 909 (9th Cir. 1969), demonstrates, reduced production costs could result in increased profits and could thus qualify the mineral as having a distinct and special value. Here, the evidence taken in the light most favorable to Anderson suggests that he could earn a profit for his stone higher than those earned by competitors. Anderson sold approximately twenty-six tons of rock for $40 per ton to Burnett without incurring any overhead costs. Fairbanks Sand and Gravel was keeping several tons of Anderson slate on consignment, of which they had sold 1.85 tons for $85 per ton. Anderson received $50 per ton from this arrangement and testified that he could bring the stone to market for $15 per ton.[17] Thus, Anderson was capable of making a profit of from $35

fact, exists whenever it can be said that from the evidence and all reasonable inferences to be drawn therefrom, fair minded people in the exercise of reasonable judgment could reach differing conclusions on the issue in controversy.

The standard is the same for review of a ruling pertaining to a judgment n. o. v. *See Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974).

16. *See* note 7 *supra*.

17. Later, in trying to describe an economical method of hauling his rock in bulk, Anderson testified that he could deliver 174 tons of rock in one day at a cost of $2825. This is equivalent to costs of $16.24 per ton.

to $40 per ton, as compared to the quarry owners' profits of $15 per ton for Fox marble and $25 per ton for Shaw Creek rock. Therefore, we conclude that there was evidence indicating that Anderson had a profit advantage sufficient to warrant a jury's finding that Anderson's slate possessed a distinct and special value. Given this conclusion we hold that the superior court did not err in denying Alyeska's motions for a directed verdict and judgment n. o. v.

■ Concerning the prudent person and marketability tests, lack of sales constitutes evidence that Anderson's rock was not marketable in 1966. However, as previously noted, it is unnecessary for Anderson to show actual profitable sales, but only that the rock could have been marketed at a profit.[18] A recent Interior Board of Land Appeals decision notes that there may be a variety of acceptable reasons why a marketable mining claim is not being profitably pursued at any given time. *United States v. Williamson*, 45 IBLA 264, 285 (1980). In this case, Anderson testified that his new job had made him unavailable to actively mine the claim and develop a market. Other testimony before the jury suggests a valid finding of marketability. Anderson estimated that his slate could capture one third of the building stone market; a Fairbanks stone mason testified that he thought it could capture one half of the market. An employee of Fairbanks Sand and Gravel, when asked whether Anderson's stone was marketable, stated: "It's marketable. I don't know how much. Time will tell. Our idea is to give people their choice." Jack Pruitt, a local stone mason, testified: "There has not been too much of the [slate] marketed ... [n]ot because it is not a marketable rock .... It just has not gone over ...."

We think the foregoing evidence, taking such evidence in the light most favorable to Anderson, warrants the conclusion that reasonable persons could differ as to the outcome of the prudent person and marketability tests. Thus, we conclude that the superior court did not err in allowing the jury to make a determination of whether this was a valid mining claim.

III. Refusal to Stay Trial Pending the Department of the Interior's Determination of the Validity of Anderson's Mining Claim.

■ One month prior to trial Alyeska moved for a stay pending the outcome of an investigation by the Bureau of Land Management of the validity of Anderson's mining claim. This motion, and a subsequent motion to stay this appeal, were denied.

By February 1980 all that had occurred by way of administrative action by the Bureau of Land Management was the issuance of an initial report which recommended that "contest action seeking to declare the Greenstone # 1 Claim null and void, *ab initio*, be initiated." Alyeska claims that the superior court should have stayed proceedings in this lawsuit until the United States Government and the Secretary of the Interior were able to make a final determination of the validity of Anderson's mineral claim. Alyeska supported its motion only by affidavits which asserted that a validity determination would be forthcoming.

Mindful of the long delay that might be necessary for final adjudication in a federal contest action of Anderson's mining claim,[19] we are of the opinion that the issue of a mining claim's validity is not subject exclu-

---

18. *See* 1 American Law of Mining §§ 4.84 & 4.88 (1980); Reeves, *The Law of Discovery Since Coleman*, 21 Rocky Mtn. Mineral Law Inst. 415, 428 (1976) and cases cited therein.

19. For an illustration of the time necessary for administrative adjudication, *see United States v. California Soylaid Products*, 5 IBLA 179 (1972). The initial validity examination report in that case was dated December 1963. *Id.* at 182. The contest action was initiated in June 1964 with a hearing held November 1965 and a decision rendered January 1966. *Id.* at 182–83. An appeal was taken from the hearing examiner's decision, and in September 1968 the case was remanded to the hearing examiner. *Id.* at 184. That hearing was held in April 1970. *Id.* at 185. The case again went before the Board of Land Appeals, which rendered its decision in March of 1972. *Id.* at 179.

sively to administrative determination. Of significance here is 30 U.S.C.A. § 53 (West 1971) which provides:

> No possessory action between persons, in any court of the United States, for the recovery of any mining title, or for damages to any such title, shall be affected by the fact that the paramount title to the land in which such mines lie is in the United States; but each case shall be adjudged by the law of possession.[20]

Our reading of the record indicates that the superior court denied Alyeska's motion for a stay on the basis that 30 U.S.C.A. § 53 permitted the maintenance of Anderson's action.

*Duguid v. Best*, 291 F.2d 235 (9th Cir. 1961), *cert. denied*, 372 U.S. 906, 83 S.Ct. 713, 9 L.Ed.2d 716 (1963), dealt with a situation similar to the present one. That case involved a trespass action in which owners of a mining claim alleged partial ouster as a consequence of the construction of an irrigation district. In its opinion the Ninth Circuit stated:

> We are satisfied from our review of the authorities and the provisions of Section 53, Title 30 U.S.C.A. supra, that appellants resorted to the proper forum in instituting their action in the Superior Court of the State of California, in and for the County of Butte, against the irrigation district to recover damages for the alleged trespass of the irrigation district on the possessory interest of appellants in the mining claim. Under the express language of said Section 53 the paramount title of the United States to the land in which such mining claim lies is not affected by such lawsuit, and the rights of the parties to such lawsuit must be adjudged by the law of possession. We recognize that there is a dispute between the parties as to the nature of appellants' posses-

sory interest. In the district court appellants alleged they are owners of a perfected claim, and on motion for summary judgment appellees assert that the claim of appellants was not perfected because of lack of discovery and the non-mineral character of the lands.

> In exercising jurisdiction to determine the possessory interests as between appellants and the irrigation district, the state court may be required to determine the mineral or non-mineral character of the land and the question of whether discovery has been made, where such a determination is necessary to settle the controversy before it. We agree with the view of the California courts that it is not improper for state courts to make such a determination but such determination affects only the possessory interests of the litigants and has no effect upon the paramount title of the government.[21]

*Id.* at 239 (citations omitted).

One of the grounds advanced by Alyeska in support of its motion for a stay is that "primary jurisdiction" is in the Department of the Interior. The doctrine of primary jurisdiction was discussed in *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379, 1382–83 (Alaska 1974) (footnote omitted). There we said:

> The legal theory which forms the touchstone of appellants' argument is founded on the administrative law doctrine of primary jurisdiction. We are instructed by Professor Davis that the doctrine of primary jurisdiction deals with the question of whether a court or an administrative agency should make the initial decision on a given issue. 3 K. Davis, Administrative Law Treatise § 19.-01 at 2 (1958). Its purpose is to help a court decide whether it should refrain

---

**20.** The superior court ruled that a valid mining claim was necessary to Anderson's ability to recover and the trial was based on this ruling. The basis for this action is possession under a valid claim; and the question of paramount title need not be determined. *Duguid v. Best*, 291 F.2d 235, 239 (9th Cir. 1961), *cert. denied*, 372 U.S. 906, 83 S.Ct. 713, 9 L.Ed.2d 716 (1963).

**21.** The cases cited by Alyeska suggesting that a stay was mandated all involve circumstances where the United States was a party to the litigation. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Wetsel v. Superior Court*, 119 Cal. App.2d 703, 260 P.2d 242 (1953).

from exercising its jurisdiction until after the agency has determined some question or an aspect of some question arising in the proceedings before the court. The operational concept underlying the doctrine is the need for an orderly and reasonable coordination of the work of agencies and courts. Whatever the agency's expertise, opines Davis, the court should not act on a subject peculiarly within the agency's specialized field without first taking into account what the agency has to offer. Otherwise, litigants who are subject to the agency's continuous regulation may become victims of uncoordinated and conflicting requirements.

This, of course, is hardly to say that the courts must in each and every case defer to an agency determination. For implicit in the concept of orderly and reasonable coordination is the requirement that the question of deferring to agency expertise be decided with reference to the unique facts of each case.[22]

As Anderson notes, there is no exclusive or primary agency jurisdiction over cases like the present one since Congress has, by virtue of its enactment of 30 U.S.C.A. § 53, granted specific authority to the courts to decide possessory actions involving mining claims. Further, we think it significant that at the time the superior court acted on Alyeska's motion for stay it had no indication as to when a decision on the validity of Anderson's claim would be forthcoming from the Bureau of Land Management.[23] Thus, we conclude that the superior court did not misapply the doctrine of primary jurisdiction and that its refusal to grant a stay was appropriate in the circumstances.[24]

## IV. Instruction on the "Harsh" Form of Damages.

Alyeska contends that the superior court erred in instructing the jury on a "harsh" form of damages in regard to its alleged conversion of rock from Anderson's claim. Alyeska first asserts that such an instruction is inconsistent with the superior court's grant of a directed verdict against Anderson's claim for punitive damages.[25] The court instructed the jury as to both the harsh and mild rules of trespass-conversion damages. It based its instructions on *Alaska Placer Co. v. Lee*, 553 P.2d 54, 57–58 (Alaska 1976) (footnotes omitted), where we stated:

When a trespasser removes minerals from the land of another, there are two generally accepted rules of damages: a 'mild' rule for good faith trespassers and a 'harsh' rule for willful trespassers. The mild rule provides that a good faith trespasser must pay the owner damages based either on a royalty rate or on the market value of the minerals less cost of extraction. Thus, the nonwillful trespasser may receive credit for the mining expenses involved in the conversion.

The harsh rule for intentional trespassers operates as a form of punitive damages, with the goal of deterrence. The owner may recover the market value of the converted minerals without offset or

---

**22.** *See also Greater Anchorage Area Borough v. City of Anchorage*, 504 P.2d 1027, 1032–33 (Alaska 1972), *overruled on other grounds, City and Borough of Juneau v. Thibodeau*, 595 P.2d 626, 629 (Alaska 1979).

**23.** *See note 19 supra.*

**24.** As to issues which deal with the necessity of proof of Anderson's title, Anderson argues that Alyeska is estopped to deny his title because Alyeska leased the land. Estoppel is asserted under a general rule that a tenant is estopped to question the landlord's title. This issue was raised before the superior court, which ruled that the lease was only of the right-of-way and not the entire mining claim. The court's ruling was not appealed and is not before this court.

**25.** Specifically, the superior court held:

The court doesn't feel that the plaintiffs have met the burden with respect to punitive damages.... [W]hen we talk about intentional, willful, malicious or conduct in reckless disregard of a person's rights—the Court doesn't feel that reasonable minds could differ with respect to Alyeska. There's no question that—at least, with Mr. Wemmer and Price that it is, but the Court can't go from them to Alyeska under the law ....

In any event, the Court is going to grant the motion with respect to the punitive damages, but deny it with respect to the compensatory claim.

deduction for the trespasser's mining costs.

'Good faith,' in the context of trespass on mineral claims, has been defined as an 'honest and reasonable belief' that the taking is rightful; and 'honest intention' not to take 'unconscientious advantage of another.' The United States Supreme Court has stated that good faith in this context is 'something more than the trespasser's assertion of a colorable claim to the converted minerals.' In the instant case, the trial court found that the Lees were good faith trespassers and applied the 'mild' rule of damages.[26]

■ It is apparent from the superior court's ruling that it concluded that the harsh rule of damages for trespass-conversion cases, while punitive in nature, is distinct from what we normally understand to be punitive damages. One distinguishing feature is the burden of proof appropriate to the two situations. In a determination of the appropriateness of the harsh form of damages, it is the defendant trespasser who must prove that the trespass was not willful in order to demonstrate that the mild form of damages is applicable.[27] *Alaska Placer Co. v. Lee*, 553 P.2d 54, 58 (Alaska 1976). On the other hand, as the superior court stated, the normal rule is that the burden of proof as to punitive damages is upon the party seeking the recovery of the same. D. Dobbs, *Handbook on the Law of Remedies* § 3.9 (1973).

Another distinguishing feature between harsh conversion damages and punitive damages also concerns burden of proof. The quantum of evidence necessary to support punitive damages was set forth in *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 46 (Alaska 1979), *on reh.* 615 P.2d 621 (Alaska 1980). There we stated:

In *Bridges v. Alaska Housing Authority*, 375 P.2d 696, 702 (Alaska 1962), this court noted that in order to recover punitive or exemplary damages, the plaintiff must prove that the wrongdoer's conduct was 'outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another.' Actual malice need not be proved. Rather, '[r]eckless indifference to the rights of others, and conscious action in deliberate disregard of them ... may provide the necessary state of mind to justify punitive damages.' Restatement (Second) of Torts, § 908 (Tent.Draft No. 19, 1973).

Thus, in order to go to the jury on the issue of punitive damages, Anderson was obliged to adduce evidence to show that Alyeska's conduct was "outrageous," as defined in *Sturm, Ruger.* The superior court concluded that Anderson did not produce sufficient evidence to permit an instruction on punitive damages.

■ This is not inconsistent with the court's instruction on the harsh form of conversion-trespass damages. Alyeska had the burden of proving that the trespass was not willful to avoid an instruction on the harsh form of damages. The court determined that Alyeska did not meet this burden of proof. It concluded that reasonable persons could differ as to whether Alyeska had acted in good faith when it removed the rock from Anderson's claim, and a jury question was thus presented on this question of fact. Thus, we find no error in the superior court's instruction concerning the harsh form of trespass-conversion damages.

■ Alyeska further contends that the superior court's instructions in regard to conversion damages were misleading in that they failed to inform the jury that the harsh rule of damages was in essence a

---

26. *See generally* Schwinn, *Tort Liability Resulting From Mining Operations*, 8 Rocky Mtn. Mineral Law Inst. 461, 474–83 (1963); Annot., 21 A.L.R.2d 380 (1952 & 1980 Supp.).

27. The jury was instructed:
   The defendant has the burden of establishing by a preponderance of the evidence the following issue:

1. That the defendant had an honest and reasonable belief that the removal, if any, of material from plaintiffs' claim was rightful
   . . . .

*See* Schwinn, *Tort Liability Resulting From Mining Operations*, 8 Rocky Mtn. Mineral Law Inst. 461, 479–80 (1963).

form of punitive damages. Alyeska asserts that the superior court erred in refusing to give its proposed instruction setting forth the elements of state of mind requisite to an award of punitive damages. As we have noted, the elements which must be proven to justify an award of punitive damages are more stringent than those necessary for the imposition of the harsh form of damages in a mining trespass-conversion action. Thus, we conclude that there was no error in the superior court's rejection of this instruction.[28]

### V. Remittitur and Motion for New Trial.

Alyeska claims that the award of $1,911,429.40 is punitive and is "so far in excess of any reasonable amount" that the superior court should have ordered a remittitur or a new trial. The standard applicable to review of the superior court's decision on remittitur or new trial was set forth in *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 48 (Alaska 1979) (citation omitted), *on reh.* 615 P.2d 621 (Alaska 1980), as follows:

> We have previously held that the decision to order a remittitur or a new trial rests within the sound discretion of the trial court. We will not interfere with the trial court's decision unless we are 'left with a firm conviction on the whole record that the trial judge made a mistake in refusing to order a remittitur or grant a new trial.' *City of Nome v. Ailak*, 570 P.2d 162, 173 (Alaska 1977) (footnote omitted), and where intervention on our part is necessary to prevent a miscarriage of justice.

Anderson argues that, if the jury applied the harsh rule of damages, the award was well within the range indicated by evidence pertaining to the amount and value of the rock taken from his claim. He also submits that the award would be consistent even with the mild rule of damages. After reviewing the evidence we have concluded that the award was not excessive.

Alyeska argues further that the limited market for decorative stone must be considered in determining whether the damages were excessive and that it would take decades for the local market to absorb the amount of building stone which was taken by Alyeska. Alyeska requested no instruction concerning this view and has cited no cases in support of it. Regardless of the market for building stone, Alyeska needed the stone for pipeline construction and by its tortious conduct created a separate market for the stone in the amount it used. Alyeska did not submit any evidence in mitigation of the damages. Thus, we conclude that the superior court did not err in refusing to order a remittitur or a new trial.[29]

### VI. Prejudgment Interest.

Anderson, in his cross-appeal, specifies as error the superior court's failure to award prejudgment interest. Anderson moved for an award of prejudgment interest from the date he instituted his action against Alyeska. After extensive briefing, the court denied the motion on the ground that "under the facts and circumstances of this case, an award of pre-judgment interest would do an injustice."

In *State v. Phillips*, 470 P.2d 266, 274 (Alaska 1970), in regard to prejudgment interest, we said:

---

28. Alyeska also asserts that Anderson's knowledge of and failure to prevent the taking of rock from his claim on other occasions constituted a waiver. Waiver is an affirmative defense that must be pled. Alaska R.Civ.P. 8(c). No motion to amend the pleadings was ever made nor was this issue raised as a point on appeal. We therefore do not consider it. *See* Alaska R.App.P. 210(e).

29. Alyeska also asserts that the damages awarded for trespass-conversion were, in essence, for lost profits and as such are too spec-

ulative to support the jury's award. *See State v. Stanley*, 506 P.2d 1284, 1294–95 (Alaska 1973). However, in the case at bar fairly ascertainable amounts of minerals were misappropriated. Although the precise tonnage misappropriated is in dispute, the amount and value of the rock removed is far from speculative. Thus, we do not find the award "speculative," and cannot conclude that the superior court abused its discretion in failing to order remittitur or a new trial on this ground.

For a cause of action to accrue, one party must have breached a duty to the other, and the other must have been injured. At the moment the cause of action accrued, the injured party was entitled to be left whole and became immediately entitled to be made whole. Whenever any cause of action accrues, therefore, the amount later adjudicated as damages is immediately 'due' in the sense of AS 09.50.280 and AS 45.45.010(a). All damages then whether liquidated or unliquidated, pecuniary or nonpecuniary, should carry interest from the time the cause of action accrues, unless for some reason peculiar to an individual case such an award of interest would do an injustice.

This subject was subsequently elaborated on in *Haskins v. Shelden*, 558 P.2d 487, 494–95 (Alaska 1976) (footnotes omitted), where we said:

> Prejudgment interest is in the nature of compensation for use by defendant of money to which plaintiff is entitled from the time the cause of action accrues until the time of judgment. It is not meant to be an additional penalty.

> Prejudgment interest is not to be awarded where its award would do an injustice. However, it is only in the most unusual cases that prejudgment interest is not proper. One such unusual case is where the award of such interest would result in a double recovery.

Thus, the question on review is whether this case falls within the narrow class of cases in which an award of prejudgment interest is inappropriate. We conclude that the superior court was correct in its determination that an award of prejudgment interest to Anderson would work an injustice. The jury's award of damages was based on the value of the rock as decorative building stone. The superior court could therefore have reasonably concluded that the jury's award was substantially higher than the amount Alyeska would have paid for the material for use in construction of the pipeline. Since, as Alyeska notes, it would have taken decades for Anderson to market the rock as building stone, it cannot be said that Anderson suffered a loss of income at the time it was wrongfully removed. Because Anderson suffered no loss of income and was adequately compensated for the losses he incurred, the superior court was justified in denying prejudgment interest.

## VII. Attorney's Fees.

■ Anderson requested attorney's fees in the amount of $224,000.22, pursuant to Civil Rule 82(a)(1).[30] Alyeska argued that this case was governed by Rule 82(a)(2),[31] which allows the court to award fees "commensurate with the amount and value of legal services rendered" when the amount of the recovery is not an accurate criterion for making the determination. The superior court requested an itemization from Anderson of counsel's time and costs and, after reviewing it awarded $100,000 in attorney's fees.

The superior court gave the following explanation for its award of attorney's fees:

> Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

---

**30.** Alaska R.Civ.P. 82(a)(1) provides:

Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

**31.** Alaska R.Civ.P. 82(a)(2) provides:

In actions where the money judgment is not an accurate criteri[on] for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

Plaintiffs requested attorney's fees as the prevailing party pursuant to Alaska Civil Rule 82 in the sum of Two Hundred Twenty-four Thousand Dollars and Twenty-two cents ($224,000.22). Plaintiff, pursuant to a request of the Court, filed an itemization of time expended, showing approximately 400 hours spent in connection with this matter. The Court feels that even at $100 per hour for a billing rate, the total attorney's fees on a time basis would only be Forty Thousand ($40,000) Dollars. The Court feels that the formula of Alaska Civil Rule 82 is disproportionate to the actual attorney's fees but in light of the jury verdict, and effort expended, a deviation from the formula of Rule 82 is appropriate and therefore, attorney's fees of One Hundred Thousand ($100,000) Dollars is awarded.

Anderson argues that the superior court erred in determining that a deviation from the Rule 82(a)(1) formula was indicated.

We have required the trial court to state its reasons for making an award of attorney's fees which varies from the schedule in Rule 82(a)(1). *Miller v. McManus*, 558 P.2d 891, 893 (Alaska 1977); *Fairbanks Builders, Inc. v. Sandstrom Plumbing & Heating, Inc.*, 555 P.2d 964, 966 (Alaska 1976); *Patrick v. Sedwick*, 413 P.2d 169, 179 (Alaska 1966). Because the superior court did state reasons for its deviation from the Rule 82(a)(1) schedule, our task on review is to determine whether the resulting award was an abuse of discretion. "Abuse of that discretion is established only by a 'manifestly unreasonable' award." *Haskins v. Shelden*, 558 P.2d 487, 495 (Alaska 1976).

Anderson attacks only a portion of the superior court's reasoning, focusing on the statement that "the formula of Alaska Civil Rule 82 is disproportionate to the actual attorney's fees." Counsel has an existing contingent fee arrangement with Anderson that calls for fees of approximately 40% of the difference between the damages awarded by the jury and the costs incurred in pursuing the action. Anderson's counsel, then, stands to earn an attorney's fee of approximately $750,000, and for that reason contends that the superior court erred in holding that the amount provided for in Civil Rule 82(a)(1) was disproportionate to the actual attorney's fees incurred.

Considering the reasoning of the superior court in its entirety, we believe that it was the comparison between the Civil Rule 82(a)(1) award and the number of attorney hours spent on the case that caused the superior court to depart from the schedule. Attorney's fees as requested would have resulted in an award of fees of $560 per hour. The superior court took the position that the money judgment was not an accurate criterion for determining fees in light of the amount of time counsel had devoted to the case and the multi-million dollar recovery. In *State v. Abbott*, 498 P.2d 712, 730–31 (Alaska 1972), we upheld a deviation from the Civil Rule 82(a)(1) formula where the trial court concluded that that formula produced a figure that was disproportionately large in view of the amount of time counsel had devoted to the case. We adhere to our holding in *Abbott* and find no abuse of discretion in the superior court's deviation from Rule 82(a)(1).

## VIII. Punitive Damages.

As his final specification of error, Anderson alleges that the superior court erred in granting a directed verdict for Alyeska on his claim for punitive damages. As we have already noted, the superior court concluded that Anderson had not shown Alyeska's actions to be "outrageous," and that punitive damages were therefore inappropriate. *See Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 46 (Alaska 1979), *on reh.* 615 P.2d 621 (Alaska 1980).

We need not reach the question of whether Anderson presented sufficient evidence to reach the jury on the issue of punitive damages. In the particular factual context of this record, we are persuaded that it would have been inappropriate to have al-

lowed the jury the option of awarding both harsh damages for Alyeska's trespass and conversion and punitive damages. Given the general policy that punitive damages are not favored and are to be awarded with caution and within narrow limits,[32] we hold that harsh trespass-conversion damages should be the only form of damages recoverable in the case at bar. Thus, the superior court did not commit error in granting a directed verdict in Alyeska's favor as to punitive damages.

AFFIRMED.

MATTHEWS, J., dissents.

COMPTON, J., not participating.

MATTHEWS, Justice, dissenting.

I disagree with the majority opinion concerning the motion for remittitur or new trial. I would hold that the damages arrived at by the jury were so excessive that the trial judge abused his discretion in denying the motion.

In reviewing trial court decisions on motions for remittitur or new trial, the appropriate standard of review was articulated in *National Bank of Alaska v. McHugh*, 416 P.2d 239, 244 (Alaska 1966), as follows:

> We have held that the granting or refusing of a request for a new trial is discretionary with the trial judge. We do not interfere in the exercise of that discretion except in the most exceptional circumstances and to prevent a miscarriage of justice. In order for us to hold that the trial judge has abused his discretion, we would have to be left with the definite and firm conviction on the whole record that the judge made a mistake in refusing to order a remittitur or grant a new trial in response to appellant's motion. [footnotes ommitted].

A few cases illustrate under what circumstances this court will overturn the trial court's refusal to order a remittitur or grant a new trial. In *City of Nome v. Ailak*, 570 P.2d 162 (Alaska 1977), the appellees brought a civil action in tort against the city and city police officers for false arrest, false imprisonment and trespass. The trial court awarded damages of $10,000.00 for the trespass, $45,000.00 for the false arrest and $45,000.00 for the false imprisonment. After holding that the trespass was privileged and that there was no basis for the $45,000.00 apiece for the false arrest and false imprisonment because they are not separate torts, we ruled that the remaining $45,000.00 awarded to Ailak for false arrest was clearly excessive and without support in the evidence. Noting that there was no evidence of any physical injury to Ailak and only scant evidence of emotional distress, we held that the refusal to order a remittitur of the award of $45,000.00 in compensatory damages for the detention was an abuse of discretion.

*Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38 (Alaska 1979) was a products liability case in which the buyer of a single-action revolver shot himself in the leg while unloading. Day was awarded compensatory damages of $137,750.00 and punitive damages of $2,895,000.00. Noting that the punitive damage award of $2,895,000.00 was so far out of proportion to the amount of actual damages as to suggest that the jury's award was the result of passion or prejudice, we held that it was a mistake and an abuse of discretion for the trial judge not to have reduced the punitive damages or to have ordered a new trial.[1]

In *Alyeska Pipeline Service v. Aurora Air Service*, 604 P.2d 1090 (Alaska 1979), we directed the superior court to order a remittitur or grant a new trial because the jury had arrived at the damage amount in an improper manner. Aurora alleged that Alyeska had intentionally interfered in its contractual relationship with Radio Corporation of America and submitted evidence

---

**32.** *Alaska Placer Co. v. Lee*, 553 P.2d 54, 61 (Alaska 1976).

**1.** On rehearing, we held that the punitive award was not the result of passion or prejudice, but was simply an excessive verdict and that the award should be reduced to $500,000.00 rather than $250,000.00 as set in the first opinion. *Sturm, Ruger & Co., Inc. v. Day*, 615 P.2d 621, 624 (Alaska 1980).

of two different figures representing its losses due to termination of the contract. One figure was the specific loss stemming from the cessation of the contract and the other was the loss of projected earnings. The latter figure included the former. When it became evident that the jury had erroneously added together these two figures in arriving at its damage award, we concluded that the superior court had abused its discretion in failing to grant the motion for remittitur or new trial.

Reviewing the record in the present case leaves me with a firm conviction that the trial judge abused his discretion in failing to order a remittitur or grant a new trial. It is clear that the jury either arrived at its damage award in an inappropriate manner or simply ignored the evidence and awarded an excessive amount.

The basic principle of damages is that the damaged party should be put in the position in which he would have been but for the tort. Restatement (Second) of Torts § 901, Comment a, (1977). Here if Alyeska had never touched the plaintiffs' property, plaintiffs at best could have been selling about 200 tons of rock per year at about $80.00 per ton which would mean that they would gross around $16,000.00 per year. This sum need not be offset for extraction costs under the harsh rule of damages. What sum is necessary to produce $16,-000.00 per year forever? It depends on the interest rate of course; 7.5% is certainly fair from the plaintiffs' standpoint. If that rate is used the total award should not exceed $240,000.00. Because this sum is so at variance with the $1,900,000.00 actually awarded I do not think that the award can be allowed to stand.[2]

This result is not inconsistent with *Beaulieu v. Elliott*, 434 P.2d 665, 671–72 (Alaska 1967). There we held that tort recovery for loss of future wages should not be discounted to present value due to 1) the predictable impact of inflation, and 2) the probability of "wage increases that the injured plaintiff might have expected to receive in the future had he not been injured." The latter justification we interpreted in *State v. Guinn*, 555 P.2d 530, 546 (Alaska 1976), to refer to "those non-scheduled salary increases and bonuses that are granted as one 'progresses in his chosen occupation' in terms of skill, experience and value to the employer." Furthermore, in *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 933 (Alaska 1977) we noted that "[w]hile the first reason may be of questionable validity, the constantly increasing wage factor still justifies the *Beaulieu* result." I read these cases as limiting the rule of *Beaulieu* to the loss of future earnings in personal injury actions since that is the only area in which the second justification exists. This was apparently the conclusion of the court in *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 226 (Alaska 1978) where we stated:

> *Beaulieu* has limited applicability to contract cases; and we decline to follow it in damage awards for loss of future profits since the impact of inflation on the profit margin is unclear. Receipt of the profits prior to the time they would have accrued but for the breach allows an opportunity for investment of the same.

Since it is clear to me that the jury award of $1,900,000.00 is excessive and can not be supported by any reasonable interpretation of the evidence, I would remand this case to the superior court with directions to order a remittitur or a new trial.

---

**2.** Even the $240,000.00 figure is extremely favorable to the plaintiffs. They had sold, in total, over the 13 year period they owned this claim prior to trial, only 34 tons of rock for which they had received gross receipts totalling approximately $1,620.00. Most of this material was quarried after Alyeska's taking, which raises the question of whether there does not remain sufficient rock to fulfill the reasonable requirements of the Fairbanks market for this type of rock for the indefinite future. There is no other evidence in the record on this point. In my view, using sales projections based on the rock's value as decorative stone is unrealistic in this case because as a practical matter it could never be sold at such prices in the quantities involved here.