Anthony W. SCHMIDT, Appellant,

v.

BEESON PLUMBING AND HEATING, INC., Great American Insurance Co., and Industrial Indemnity, Inc., Appellees.

No. S–5426.

Supreme Court of Alaska.

Feb. 25, 1994.

Richard L. Harren, Wasilla, and Susan D. Mack, Anchorage, for appellant.

Richard L. Wagg, Russell, Tesche & Wagg, Anchorage, for appellees, Beeson Plumbing & Heating and Indus. Indem. Ins. Co.

Phillip J. Eide, Eide & Miller, Anchorage, for appellees, Beeson Plumbing and Heating, Inc. and Great American Ins. Co.

Toby N. Steinberger, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee, Alaska Workers' Compensation Bd.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J. Pro Tem.*

## OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

In this workers' compensation appeal, Anthony Schmidt argues that a degenerative disc disorder in his neck and shoulder is a result of heavy lifting while he was employed with Beeson Plumbing & Heating, Inc. (Beeson). The Alaska Workers' Compensation Board (the Board) denied his claim, on the ground that his employment with Beeson was not the cause of his condition. Schmidt argues that Beeson's workers' compensation carriers waived certain defenses, that his second hearing before the Board violated due process, and that the Board improperly appointed to the hearing panel a third member who had not been physically present at Schmidt's second hearing. We affirm in part and reverse in part.

## II. FACTS AND PROCEEDINGS

Schmidt worked at Beeson from April 1987 to November 1988. During this time two successive carriers provided workers' compensation insurance for Beeson. Great American Insurance Co. (Great American) insured Beeson until mid-April 1988. Industrial Indemnity Insurance Co. (Industrial Indemnity) insured Beeson thereafter.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

In July 1987, while working on a project that spanned several months and involved frequent heavy lifting, Schmidt began to experience persistent pains in his right shoulder. Schmidt could not attribute the occurrence of this pain to any particular event, stating that he "just noticed the pain start" in his shoulder approximately one month after the project began.

In August he sought treatment from Dr. Richard Strohmeyer for his shoulder problem, pain in his right knee, and a hand injury from a drill accident. In his chart notes, Dr. Strohmeyer stated that Schmidt did not relate his shoulder pains to any specific on-the-job injury but that Schmidt . "in working, using his shoulder a lot he has noticed the increased discomfort lately, in the right shoulder." Dr. Strohmeyer's diagnosis of the condition was degenerative joint disease in the AC joint. Schmidt testified that the doctor told him that the shoulder discomfort resulted from arthritis. Dr. Strohmeyer prescribed Motrin for the pain, and allowed him to return to work. Schmidt and Beeson filed a notice of occupational injury with the Board.

· Schmidt saw Dr. Strohmeyer twice over the next few months. At a September 1987 visit, which focused primarily on the knee and hand injuries, Schmidt "incidentally mention[ed]" that his shoulder was better with the Motrin. Schmidt made a return visit in January 1988. The chart notes for this visit are focused almost solely on his knee injury, but a handwritten notation stated, "Shoulder helped by Motrin." Schmidt testified that the Motrin actually did little for his pain, but that because Dr. Strohmeyer told him that the shoulder was arthritic and that there was no cure, Schmidt made no further visits for over a year. Meanwhile, Schmidt continued working for Beeson, performing the same job duties with the same physical demands, until in November 1988 he took a vacation and was essentially laid off upon his return.[1]

In January 1989 Schmidt's pain intensified, spreading to his elbow, forearm, and hand. Schmidt returned to Dr. Strohmeyer's office in mid-February. Dr. Richard Dix, who was substituting for Dr. Strohmeyer at the time, diagnosed "a radiculopathy that is perhaps related to a degenerative disc." Dr. Strohmeyer saw Schmidt at the end of February, found a herniated cervical disc of "progressive, unrelenting nature, present over ... a long period of time," and referred Schmidt to Dr. Michael Newman. Dr. Newman examined Schmidt a few days later, and also identified cervical disc degeneration with radiculopathy. Dr. Newman saw Schmidt on two other occasions in 1989, and sent him to a colleague for injections of cervical epidural steroids.

When Schmidt reopened his workers' compensation claim after his visit with Dr. Dix, both workers' compensation carriers controverted Schmidt's claim. Great American filed its controversion notice in March 1989, on the grounds that no medical documentation linked Schmidt's current condition to the events of July 1987, that the July 1987 injury was a temporary aggravation of a preexisting condition, and that the last injurious exposure rule relieved Great American of liability.[2] Industrial Indemnity filed its notice of controversion in May 1989, on the grounds that it could not determine whether Schmidt suffered a new injury in 1989, and that no medical data showed a link between his condition and his employment with Beeson. In July 1989 Industrial Indemnity filed another notice of controversion, asserting that because Schmidt "suffered medical problems continuously after the 1987 injury and no injury has taken place during [the] Industrial policy period," Great American should cover his current injury.

In November 1989 Schmidt filed an application for adjustment of his claim, seeking

---

1. The record indicates that he was offered 15 hours' work, and was promised part-time work on a regular basis, but the lack of available work caused the company to be unable to provide him with any further employment.

2. Under the last injurious exposure rule, if an employee suffers successive injuries while working for different employers, and both injuries contribute to the employee's disability, then the later employer incurs full liability. *E.g., Olsen Logging Co. v. Lawson*, 856 P.2d 1155, 1159 (Alaska 1993).

temporary total disability (TTD) benefits for the period from February 14, 1989 through May 9, 1989. He alleged that his current condition was related to the heavy lifting that he did in July 1987. Among his reasons for filing the application were that each carrier asserted that the other was responsible for his claim and that both carriers had controverted his claim.

Great American and Industrial Indemnity filed separate answers to Schmidt's application. Great American's answer, filed in November 1989, contained one argument:

> The employee's claim of disability appears to arise from his February 14, 1989, injury date. Therefore, pursuant to the "last injurious exposure rule" this claim would appear to be the responsibility of the employer's carrier from the period 4/19/88 onward: Industrial Indemnity Company. Pursuant to AS 23.30.155(d) Industrial Indemnity should make all payments due during the pendency of this dispute.

Industrial Indemnity's answer, filed in December of the same year, admitted the validity of Schmidt's TTD claim for February through May 1989, but included the following statement: "We reserve the right to raise further defenses after discovery."

In December 1989, Industrial Indemnity paid TTD benefits covering the period for which Schmidt requested them. In its compensation report, Industrial Indemnity stated that it was "lifting [its] controversion at this time."

A prehearing conference was held in February 1990. Industrial Indemnity stated that it had paid Schmidt TTD benefits pursuant to AS 23.30.155(d).[3] The conference notes also indicate that Industrial Indemnity alluded to two possible defenses: that Schmidt's condition may have been the result of the 1987 injury alone, and that the carrier never received actual notice of Schmidt's injury. The notes also indicate that the carriers raised a last injurious exposure defense.

In April 1990 Dr. Newman furnished Industrial Indemnity with an affidavit summarizing the results of his examinations of Schmidt. Dr. Newman stated his opinion that "Mr. Schmidt's cervical disc condition did not arise as a result of his work for Beeson ... between the dates of April 19, 1988 and October 30, 1988," the period of Schmidt's employment during which Industrial Indemnity was Beeson's workers' compensation carrier. He further opined that Schmidt's employment during the same period neither "aggravate[d] his underlying cervical disc disease nor was ... [it] a substantial factor in Mr. Schmidt's present condition."

In September 1990 Schmidt suffered a flare-up of shoulder and arm pain. He saw Dr. Newman, who put him on several medications and ordered a steroid injection. Schmidt also made a TTD claim for the five days his pain had incapacitated him.

In early October the litigants assembled for another prehearing conference. Almost six months after receiving it, Industrial Indemnity disclosed Dr. Newman's affidavit to the other parties as evidence of Great American's liability. A little over three weeks later, Industrial Indemnity formally filed the Newman affidavit with the Board and served copies on the other parties.

Subsequently, Industrial Indemnity scheduled a deposition of Dr. Newman, which took place in late November 1990. At his deposition Dr. Newman testified that Schmidt's condition since 1989 not only was unrelated to his employment during Industrial Indemnity's coverage period, but also *was unrelated to the 1987 injury altogether.*

Another prehearing conference took place on February 27, 1991. At this conference the carriers indicated that they would raise defenses that Schmidt's injury neither occurred in the course of his employment nor was related to his employment with Beeson. Schmidt argued that the carriers had waived

---

**3.** AS 23.30.155(d) states in part:
 When payment of temporary disability benefits is controverted solely on the grounds that another employer or another insurer of the same employer may be responsible for all or a portion of the benefits, the most recent employer or insurer who is party to the claim and who may be liable shall make the payments during the pendency of the dispute.

such defenses. He asked for a bifurcation of the case so that the Board would address the waiver issue first. The Board refused this request, scheduled a hearing for April 5, 1991, and allowed Schmidt to raise his bifurcation and waiver issues at the hearing.

In March 1991 Industrial Indemnity amended its answer to Schmidt's application for benefits. The carrier now stated that it was not liable for the TTD benefits that it had already paid, but rather had paid them only pursuant to AS 23.30.155(d). In addition, Beeson and Industrial Indemnity "reaffirm[ed] their position that the employee's employment during their period of coverage [was] not a substantial factor in the employee's disability or need for medical treatment as per the affidavit of Michael Newman, M.D. previously filed with the board and served on all parties on November 1, 1990." The carrier again reserved the right to raise further defenses following discovery.

On April 2, 1991, Schmidt filed his list of witnesses. He identified four witnesses who would testify, among them Dr. Dix and himself.

The Board held a hearing on April 5, 1991. As of this date, the benefits at issue were the five days of TTD that Schmidt had claimed for the September 1990 flare-up, and unpaid medical expenses through April 1991. At this hearing the Board ordered an independent medical examination (IME) of Schmidt pursuant to AS 23.30.110(g) and a continuance on the other issues.[4] In response to a question from Schmidt's counsel concerning a possible additional deposition, the hearing panel's chair, Mark Torgerson, advised, "we gather that the parties were essentially ready to go today, and so we may—we may take a dim view of people trying to add to the record. Keeping in mind that if—that the results of the medical exam may compel us to change—to change on that."

Dr. Douglas G. Smith conducted the IME on April 11 and submitted his evaluation on April 22. He found cervical disc degenera-

tion, agreed with Dr. Newman that Schmidt's employment with Beeson probably did not cause Schmidt's condition, and attributed the condition to the aging process rather than to a traumatic event. Dr. Smith added that "no specific incident mentioned in the records or in Mr. Schmidt's history ... would implicate the February, 1989 problem to any particular industrial exposure." At his deposition in late May, Dr. Smith reiterated: "I think the odds are ... that the disk degeneration was caused by not being 18 years old."

On April 19 Schmidt underwent surgery, in which Dr. Newman fused three vertebrae in his neck. In May Schmidt submitted a new application for adjustment of his claim.[5] To his original claim he added the medical costs resulting from his recent neck surgery. He also filed a claim for TTD benefits from April 12, 1991 forward.

On May 22, one week before the scheduled date for the second Board hearing, Schmidt moved for a further continuance. He argued that he needed more time to review the latest medical records and Dr. Smith's deposition testimony, and to redepose Dr. Newman. In addition, Schmidt contended that his new claim for additional benefits to cover his neck surgery would of necessity cause the hearing to last longer than a day. Finally, he asserted that by reason of his recent surgery, participating in the hearing at its scheduled date would endanger his health. Schmidt also filed a revised witness list, which increased the number of witnesses that he intended to have testify at the hearing from four to twelve.

The second Board hearing was held on May 30, 1991. A two-member panel, consisting of Chair Torgerson and labor representative Harriet Lawlor, heard the case. The Board denied Schmidt's motion for a continuance and addressed only those issues that were pending before the Board at Schmidt's first hearing. The Board allowed Schmidt to present only the four witnesses identified on

---

4. Alaska Statute 23.30.110(g) states in part: "An injured employee claiming or entitled to compensation shall submit to the physical examination by a duly qualified physician which the board may require."

5. This form was filed in June 1991, after correction of a technical error.

his first witness list. In addition, the Board rejected Schmidt's waiver arguments.

The Board proceeded to hear the case on the merits. Beeson and the carriers relied on the opinions of Drs. Newman and Smith. Schmidt relied on the contrary opinion of Dr. Dix. In order to prevent the hearing from exceeding the time allotted, the Board limited the time for witness testimony.

In the following month Chair Torgerson notified the parties that he and Ms. Lawlor had been unable agree on the proper disposition of the case. In order to break the deadlock, he appointed a management Board member, Richard Whitbeck, Sr., to the panel. Chair Torgerson stated that after Mr. Whitbeck reviewed the hearing tapes, the depositions, and the documentary evidence, the Board would render a decision. Schmidt objected to Mr. Whitbeck's participation on the grounds that Mr. Whitbeck would not be able to observe the witnesses' demeanor.

█ In September 1991 the Board published its decision. It again rejected Schmidt's contention that the carriers had waived their right to assert that his condition was not work related because it pre-dated his 1987 injury. The Board also found, *inter alia*, that Schmidt's current medical condition was unrelated to his employment with Beeson. The Board denied Schmidt the five days of TTD benefits for September and medical costs through April 5, 1991. The Board expressly limited its decision to Schmidt's condition up to the date of the first April hearing, before his neck surgery. The superior court affirmed the Board decision.[6] Schmidt now brings this appeal.

6. Because the superior court acted as an intermediate court of appeal, we do not give deference to its decision. *Hester v. State, Public Employees' Retirement Bd.*, 817 P.2d 472, 474 (Alaska 1991).

7. The elements of equitable estoppel are "assertion of a position by word or conduct, reasonable reliance thereon by another party, and resulting prejudice." *Id.* at 588. Implied waiver, a variant of equitable estoppel, occurs when a party's course of conduct shows an intention to waive a right and such conduct is inconsistent with any intention other than a waiver, or if neglect to insist upon the right causes prejudice to another

## III. DISCUSSION

### A. Implied Waiver of Defenses

█ We have held that the Board has the discretion to invoke equitable principles, such as implied waiver or equitable estoppel, to bar an employer from asserting statutory rights. *Wausau Ins. Cos. v. Van Biene*, 847 P.2d 584, 588 (Alaska 1993). We will uphold a Board decision as to whether to apply equitable principles if it is supported by substantial evidence. *See id.* at 588–89.[7]

█ First, Schmidt argues that Great America's answer amounted to an implied waiver on the part of both carriers. He acknowledges that in their controversion notices both carriers initially asserted that Schmidt's injury was unrelated to his employment with Beeson. However, he alleges that Great American's answer raised only the last injurious exposure defense and that both carriers eventually "unequivocally abandoned" any other defense.

Schmidt's efforts to impute Great American's position to Industrial Indemnity are without merit. Industrial Indemnity conducted a separate defense and filed its own answer in these proceedings. Industrial Indemnity's initial answer made no mention of the last injurious exposure rule and expressly reserved the right to raise other defenses. Moreover, Schmidt's contention that at the first prehearing conference the only defense raised was that of last injurious exposure is inaccurate. Though Industrial Indemnity focused on this issue, the carrier also raised a notice defense. Such acts do not meet the standard for implied waiver. *See* cases cited *supra* note 7.

party. *Id.* at 588–89; *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978). Implied waiver cannot exist in the absence of *"direct, unequivocal conduct* indicating a purpose to abandon or waive the legal right, or *acts amounting to an estoppel* by the party whose conduct is to be construed as a waiver." *Milne*, 576 P.2d at 112 (emphasis added); *see also Van Biene*, 847 P.2d at 589 ("[N]eglect to insist upon a right only results in an estoppel, or an implied waiver, when the neglect is such that it would convey a message to a reasonable person that the neglectful party *would not in the future pursue the legal right in question.*").

In addition, Schmidt's implication that the carriers are absolutely bound by the defenses raised in their answers has little substance. Parties may amend pleadings "at any time before award upon such terms as the board or its designee directs." 8 AAC 45.050(e). Moreover, the summaries of the prehearing conferences, .not the pleadings, control the subsequent course of the suit.[8] *See* 8 AAC 45.065(c).

■ Second, Schmidt argues that Industrial Indemnity's payment of TTD benefits to Schmidt indicated its abandonment of any defense other than one based on the last injurious exposure rule. At the February 1990 prehearing conference, Industrial Indemnity stated that it paid these benefits pursuant to AS 23.30.155(d). This statute includes the following language:

> When payment of temporary disability benefits is controverted *solely* on the grounds that another employer or another insurer of the same employer may be responsible for all or a portion of the benefits, the most recent employer or insurer who is party to the claim and who may be liable shall make the payments during the pendency of the dispute.

AS 23.30.155(d) (emphasis added). Schmidt contends that on its face this requirement applies if a carrier controverts only on the grounds that another carrier is liable, and that Industrial Indemnity's payment of TTD benefits thus amounted to an admission that the carrier had no other defenses.

Schmidt is mistaken. Payment of TTD benefits pursuant to AS 23.30.155(d) does not satisfy *Milne*'s standard of direct, unequivocal conduct for waiver. Alaska Statute 23.-30.155(d) ensures that an employee receives the compensation due him or her while the carriers litigate the issue of who must pay. The purpose of this statute is not to circum-

scribe the defenses that a controverting carrier may raise.

Finally, Schmidt's argument that he suffered prejudice from the carriers' actions has little merit. He contends that the carriers did not formally raise a defense that employment and injury were not connected until the February 27, 1991 prehearing conference, a little over a month before the scheduled hearing. However, the record indicates that Schmidt first knew that such a defense was possible in November 1990, when Dr. Newman was deposed. By admitting that the testimony had surprised him, Schmidt's counsel indicated that he was aware of its significance. Moreover, on February 11, 1991, well before the prehearing conference of February 27, Schmidt filed an affidavit opposing the employer's affidavit of readiness for hearing, in part on the grounds that he had not completed discovery and needed to obtain additional depositions from Schmidt's doctors. This document is a strong indication of Schmidt's awareness that the matter was no longer just one of deciding which carrier would pay.

Thus, between Dr. Newman's deposition and the first Board hearing in early April 1991, Schmidt had approximately four months to conduct discovery and address the new issues. If prior to Dr. Newman's deposition he thought that the last injurious exposure rule was the only issue, he could not reasonably rely on this assumption afterwards. Nonetheless, Schmidt did not obtain additional deposition testimony during this time, despite his protestations that discovery had not yet been completed, and he did little to build a case linking his injury to his employment. Instead, at the February 27 prehearing conference he focused predominantly upon the waiver issue.

As his own briefs indicate, Schmidt's inaction after November 1990 was not a result of

---

8. Furthermore, the text of Great American's answer provides little support for Schmidt's position:

> The employee's claim of disability *appears to arise* from his February 14, 1989, injury date. Therefore, pursuant to the "last injurious exposure rule" this claim would *appear to be* the responsibility of the employer's carrier from the period 4/19/88 onward: Industrial Indem-

nity Company. Pursuant to AS 23.30.155(d) Industrial Indemnity should make all payments due *during the pendency of this dispute.* (Emphasis added). The use of tentative language such as "appears to arise" and "would appear to be" does not evidence an intent to abandon Great American's previous position taken in its controversion notice.

reliance on representations by the employer or the carriers. Schmidt contends that until Dr. Newman's deposition the carriers appeared to be building cases against each other, not against Schmidt. Therefore, his counsel "only monitored the litigation ... and intentionally kept Schmidt's costs to a minimum," particularly given Schmidt's impression that only the five days of TTD for September were at stake at the time. Even after the Newman deposition, Schmidt avoided extensive discovery in the hope that he could win his case on the waiver issue alone. The superior court aptly viewed these tactics as a gamble, albeit a reasonable one given financial realities. Schmidt will not be accorded relief simply because his litigation strategy proved ineffective.[9]

### B. The Board's Appointment of a Third Member to Break the Deadlock

Schmidt argues that the Board's appointment of Mr. Whitbeck to break the deadlock on the two-member panel was improper. In particular, he argues that the superior court erred in relying on provisions of the Administrative Procedure Act, AS 44.-62, to uphold the Board's appointment.[10] Because this question involves statutory interpretation, we review it under the independent judgment standard. *Hood v. State, Workmen's Compensation Bd.*, 574 P.2d 811, 813 (Alaska 1978).

The Alaska Workers' Compensation Board consists of five hearing panels, with three members each: a representative of labor, a representative of management, and either the commissioner of labor or his or her designated representative. AS 23.30.005(a). Two members of a hearing panel constitute a quorum for hearing claims. AS 23.30.005(f). In addition, a member of one panel may serve on another panel as long as a labor or management member replaces a counterpart on the other panel. AS 23.30.005(e). However, the Workers' Compensation Act offers no express procedure for breaking a deadlock on a two-member panel.

The Administrative Procedure Act governs the procedures of the Board "where procedures are not otherwise expressly provided by the Alaska Workers' Compensation Act." AS 44.62.330(a)(15). The Administrative Procedure Act includes rules governing who within an agency may participate in deciding a contested case:

If a contested case is heard before an agency

(1) the hearing officer who presided at the hearing shall be present during the consideration of the case and, if requested, shall assist and advise the agency; and

(2) a member of the agency who has not heard the evidence may not vote on the decision.

AS 44.62.500(a). Though due process requires that administrative officers "hear" the evidence presented at a hearing, they need not physically attend the presentation of the evidence, and they may "hear" the evidence by making an informed judgment on evidence received through a hearing officer.

---

**9.** Schmidt also argues that Industrial Indemnity's failure to disclose the Newman affidavit to the other parties until six months after the affidavit was obtained constituted a violation of 8 AAC 45.052(d). This regulation provides that every 30 days after the initial filing of an application or petition, a party must serve updated medical summary forms and medical reports to the other parties, if the party obtains a new medical report during the 30–day period. 8 AAC 45.052(d). Schmidt urges us to construe Industrial Indemnity's violation as a forfeiture of the right to raise further defenses after discovery.

We decline to do so. Assuming *arguendo* that Industrial Indemnity violated the regulation, Schmidt has not shown how this violation establishes an intent to waive a defense. The regulation does not identify what penalty the Board might impose on violators. Nothing in the regu-

lation's text mandates waiver of one or more defenses.

**10.** Schmidt also argues that no procedural regulations existed to permit the Board to appoint Mr. Whitbeck and that the action constituted an impermissible ad hoc procedure. The State contends that this argument has been raised for the first time on appeal. Examination of the record indicates that Schmidt indeed failed to raise this theory before the superior court or as a point on appeal before this court. He has therefore waived this argument. *See Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991). Though we express no opinion on the propriety of appointing Mr. Whitbeck in the absence of express procedures for doing so, we suggest nonetheless the promulgation of regulations dealing with future Board deadlocks of this sort.

*Earth Resources Co. v. State, Dep't of Revenue*, 665 P.2d 960, 962 n. 1 (Alaska 1983); *see also Alaska Transp. Comm'n v. Gandia*, 602 P.2d 402, 405–06 (Alaska 1979).

Schmidt argues that *Earth Resources* is not applicable because the Board does not employ hearing officers in proceedings and because Board members have broader duties than hearing officers. He argues that Board members must physically attend the hearing in order to take an active role in observation of witness demeanor, examination of witnesses, and immediate deliberations with Board members.[11]

Schmidt is mistaken. On grounds similar to those that *Earth Resources* cited, a majority of other jurisdictions allow current or new members of an administrative tribunal to participate in a decision even though they were not physically present when evidence was taken in a case, as long as they consider and act on the evidence received in their absence. *See, e.g., Cooper v. State Bd. of Medical Examiners*, 35 Cal.2d 242, 217 P.2d 630, 632–33 (1950) (interpreting statutory

provision similar to AS 44.62.500(a), and holding that an agency member need not be physically present to hear evidence); *Clairborne v. Coffeyville Memorial Hosp.*, 212 Kan. 315, 510 P.2d 1200, 1202–03 (1973) (holding that the term "hearing" relates "not to physical presence at the taking of evidence, but to certain procedural minimums to ensure an informed judgment"); *Lewandoski v. Vermont State Colleges*, 142 Vt. 446, 457 A.2d 1384, 1385–88 (1983) (upholding finding of Labor Relations Board, even though no one member was present every day of a multi-day hearing, because a quorum of two members was present at all times). *But cf. Miskovich v. City of Helena*, 170 Mont. 138, 551 P.2d 995, 1001 (1976) (holding that a member of an administrative tribunal absent from part of a hearing should not participate in the final decision, because a transcript of the hearing may not be available). *See generally* E.H. Schopler, Annotation, *Administrative Decision by Officer Not Present When Evidence Was Taken*, 18 A.L.R.2d 606, 610–14 (1951).[12]

---

**11.** Schmidt also argues that if this court allowed the Board to appoint a third member to break a deadlock, the new member likely would not be able to review evidence before the running of the statutory period for issuing a decision. Alaska Statute 23.30.110(c) states in part, "Within 30 days after the hearing record closes, the board shall file its decision."

Chair Torgerson announced the deadlock, appointed Mr. Whitbeck, and reopened the hearing record on June 20, within the 30–day period. Mr. Whitbeck was unavailable to review the tapes and hearing record until July 11. Upon Mr. Whitbeck's receipt of this material, deliberations on Schmidt's case and closing of the record were scheduled for the next regular meeting of the hearing panel. The Board met on August 8 to discuss the claim and close the record. The Board issued its final decision on Sept. 9.

Though Schmidt notes that the Board released its decision 102 days after the May hearing, he does not challenge the decision as a violation of AS 23.30.110(c). Moreover, he does not expressly argue that a violation of this provision would occur if the Board exceeded the 30–day limit as a result of having appointed a third member to break a deadlock.

**12.** Schmidt relies on *Shawley v. Industrial Comm'n*, 16 Wis.2d 535, 114 N.W.2d 872 (1962), to support his argument that observation of witness demeanor is sufficiently important to require the physical presence of Board members.

In *Shawley*, two hearings were held on a workers' compensation claim, the first before one examiner and the second before his replacement. The court concluded that a denial of due process occurred, on the ground that the second hearing examiner could not reproduce the personal impressions that the witnesses made on the first examiner. *Id.* 114 N.W.2d at 875–76; *see also Adams v. Industrial Comm'n*, 147 Ariz. 418, 419–20, 710 P.2d 1073, 1074–75 (App.1985) (finding that it was inappropriate for a replacement administrative law judge, who did not observe the testimony, to rescind the award of the original judge on the basis that it was not supported by "a preponderance of credible evidence").

Significantly, *Shawley* involved a single decisionmaker. Although ideally all decisionmakers who weigh evidence should be present to observe witness testimony, courts accept that the reality of administrative proceedings often makes that impossible. As noted above, courts generally will not overturn the decisions of tribunals, even when not every member was present at all times, as long as the court believes the entire tribunal considered the evidence in some form, and a quorum was present to observe all testimony. This is different from situations like Shawley's where the decisionmaking apparatus contains no one who observed the witnesses testifying. *Compare, e.g., Younkin v. Boltz*, 241 Md. 339, 216 A.2d 714, 716 (1966) (holding that zoning board members not present at hearings could participate in decision, because a three-member quo-

In the interest of promoting speedy summary proceedings, the Board has relaxed a number of formal procedural and evidentiary rules. For example, regulations permit Board members to participate in hearings by telephone, even though members who take part telephonically cannot observe the physical demeanor of witnesses. *See* 8 AAC 45.-070(k). Similarly, regulations permit the Board to receive in evidence depositions, even though such a practice prevents either the observation of witness demeanor or questioning of the witness. *See* 8 AAC 45.120(a).

Chair Torgerson indicated that Mr. Whitbeck would review the hearing tapes, examine the depositions and documentary evidence, and deliberate with the other Board members at the Board's next scheduled hearing date. Assuming that Mr. Whitbeck did these things, he has "heard" the evidence and his attendance at its presentation was not necessary. Schmidt does not allege that Mr. Whitbeck failed to do these things. Therefore, we conclude that the appointment of Mr. Whitbeck to the hearing panel after the hearing took place was not improper.

C. *Amended Witness List*

 Finally, Schmidt contends that by refusing his amended witness list, among other things, the Board violated his due process rights under the Alaska Constitution. *See* Alaska Const. art. I, § 7 ("No person shall be deprived of life, liberty, or property, without due process of law."). We review Board rulings that operate to exclude evidence for abuse of discretion. *See Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).

We agree with Schmidt's arguments to the extent that we conclude that the Board's limitation of witnesses constituted an abuse of discretion. When submitting his amended witness list, Schmidt relied upon 8 AAC 45.-112, which provides that whenever the Board requires the filing of a witness list, the list "must be filed with the board and served upon all parties at least five working days before the hearing." As Schmidt notes, this regulation does not distinguish between an original hearing and a hearing that had been continued from an earlier date. Nonetheless, the Board concluded that limiting Schmidt's witnesses to the ones listed for the first hearing would be more efficient, and that if Schmidt needed to present additional witness testimony regarding events subsequent to the first hearing date, he could seek modification of the award, pursuant to AS 23.30.-130(a), for a change of conditions.[13]

The possibility for modification under AS 23.30.130(a) is not a satisfactory rationale for the Board's failure to allow the amended witness list. Between the April and the May hearing, there were several developments relevant to the substantive issues of the case. First, the parties received significant additional evidence: the medical report of Dr. Smith, summarizing the results of the IME which the Board ordered at the first hearing; and Dr. Smith's subsequent deposition testimony. Second, Schmidt's neck surgery raised new factual issues as to whether his condition was work related. Schmidt should have been permitted to present witnesses to rebut Dr. Smith's testimony and to testify on the outcome and significance of his recent neck surgery.

 Among Schmidt's proposed witnesses was Dr. Morris Horning, whose testimony would have challenged Dr. Smith's conclusion that Schmidt's condition was related solely to the aging process. When he saw Schmidt in 1989, Dr. Strohmeyer ordered a magnetic resonance imaging (MRI) scan of Schmidt's spine. The MRI scan revealed disc protrusions on the right side of the spine, which Strohmeyer mentioned in a February 1989 letter to Dr. Newman. The osteophytes, or bone spurs, which were removed during

---

rum was physically present at hearings) *with Clark v. County Bd. of Appeals*, 235 Md. 320, 201 A.2d 499, 502 (1964) (overturning zoning board decision because members who attended hearings did not constitute a quorum). This concern does not arise in Schmidt's case, because the two-member panel at the May hearing constituted a quorum. *See* AS 23.30.005(f).

**13.** Alaska Statute 23.30.130(a) states in part:
 Upon its own initiative, or upon the application of any party in interest on the ground of a change in conditions, ... or because of a mistake in its determination of a fact, the board may ... review a compensation case under the procedure prescribed in respect of claims in AS 23.30.110.

Schmidt's neck surgery were also on the right side, but neither Dr. Smith nor Dr. Newman explained why the osteophytes occurred on that side alone.[14] According to the offer-of-proof that Schmidt presented at the second Board hearing, Dr. Horning would have explained this phenomenon and linked it to Schmidt's 1987 shoulder injury:

> Dr. Horning would testify that the changes occurring on that MRI in 1989 were probably the results [of an event] which occurred more than six months previously. Probably 12 to 18 months previously, and possibly longer.... He would state ... that when discs occur [sic] abruptly, people are generally more attuned to them. But as often as that occurs, discs will have some trauma which sets a degenerative process in motion, and then the degenerative process occurs within the next following months. The process of degeneration includes dehydration of the disc space, and when that happens, the vertebrae move closer together and the space between them narrows. The settling of the two vertebras [sic] and this pressure between them often result in the disc punching out the back or the side and the pressing onto a nerve.... Dr. Horning would testify the spurs and osteophytes develop when a disc loses the cushioning integrity and begins to settle together, sometimes putting pressure on the end plates of the vertebrae from the disc pulling out the side.

Given the importance of rebuttal testimony such as this, the Board's failure to allow Schmidt's amended witness list was not harmless error.

The reliance of the workers' compensation carriers on *Lajiness v. H.C. Price Construction Co.*, 811 P.2d 1068 (Alaska 1991), is not helpful to their argument. In *Lajiness*, we upheld the Board's refusal to permit the employee to call a previously unlisted witness, after the employee had filed an affidavit of readiness for hearing and had not included that witness among those specified at a number of prehearing conferences. *Id.* at 1069 & n. 2. *Lajiness* is inapposite here, because Schmidt neither filed an affidavit of readiness nor committed himself to a set number of witnesses at the prehearing conference of February 1991.

By allowing him to call only witnesses scheduled for the earlier April hearing, the Board gave too narrow a meaning to 8 AAC 45.112, and denied Schmidt an adequate opportunity to present his case. Therefore, we hold that the Board abused its discretion in refusing Schmidt's amended witness list. We remand this case for new proceedings, at which Schmidt may present the witnesses necessary to fully support his claim.[15]

## IV. CONCLUSION

We REVERSE the Board's denial of leave for Schmidt to file an amended witness list, and we REMAND to the superior court for REMAND to the Board for further proceedings in accordance with this opinion. We AFFIRM the Board's rulings on all other issues.

---

**14.** Dr. Newman did not know why osteophytes would have formed only on the right side. Dr. Smith had not seen Dr. Strohmeyer's February 1989 letter until Smith's deposition, and did not address the question of the osteophytes.

**15.** Because we have remanded this case for new proceedings, we need not address Schmidt's contention that the Board's denial of his request for continuance was an abuse of discretion.

Without citing case authority, Schmidt claims that the Board imposed impermissible time limits on the testimony of Schmidt's witnesses, specifically Dr. Dix. At the April hearing, Schmidt's counsel gave the Board an estimate of the number of witnesses that he would call and the

length of their testimony. The record indicates that at the May hearing, the Board held not only Schmidt but also the other parties to the time estimates that they had given. Reasonable Board limits on the length of witness testimony are a permissible means of controlling the Board's hearing docket, and such limits do not violate the employee's due process rights. *Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1190 (Alaska 1993). Furthermore, Schmidt failed to make an offer-of proof as to what new evidence would have been provided had Dr. Dix received enough time to testify. This omission is fatal to Schmidt's claim. *See Adamson*, 819 P.2d at 889–90.