*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JAMES P. MCGLINCHY d/b/a M&M CONSTRUCTORS, | ) ) ) | Supreme Court No. S-15277 |
| Appellant, | ) ) | Superior Court No. 4FA-11-02830 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, and DANIEL S. SULLIVAN, COMMISSIONER OF NATURAL RESOURCES, | ) ) ) ) ) ) | No. 7028 – August 7, 2015 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Joseph W. Sheehan, Law Office of Joseph W. Sheehan, Fairbanks, for Appellant. Ashley C. Brown, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

M&M Constructors submitted a permit application to the Department of Natural Resources (DNR) to mine a mineral deposit for use as construction rock. DNR denied M&M's permit application because it concluded that the mineral deposit was common variety stone. Under the Common Varieties Act,[1] "common varieties" of stone are not subject to "location," meaning they cannot be permitted through the mining law's location process. M&M appealed to the superior court, arguing that DNR wrongly denied its permit application and also denied it procedural due process. After the superior court affirmed, M&M appealed to this court. We affirm because M&M seeks to mine for common variety stone that is well within the ambit of the Common Varieties Act, and it received ample due process in the DNR proceeding.

## II.    FACTS AND PROCEEDINGS

M&M, owned by James P. McGlinchy, is the leaseholder of a mineral deposit at Flag Hill, located approximately 45 miles south of Fairbanks. M&M planned to develop the Flag Hill deposit to supply materials for a nearby Alaska Railroad project. M&M submitted a Plan of Operations to DNR in May 2010 requesting a permit to mine the land under 30 U.S.C. § 22, the General Mining Law of 1872.

The 1872 Mining Law provides that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase."[2]

---

[1]    Act of July 23, 1955, ch. 375, 69 Stat. 367 (1955) (codified as amended at 30 U.S.C. §§ 601-615 (2012)).

[2]    Act of May 10, 1872, ch. 152, 17 Stat. 91 (1872) (codified as amended at 30 U.S.C. § 22 (2012)). Alaska applies federal mining law in the absence of a specific state statute. *See* AS 38.05.185(c); *AU Int'l, Inc. v. State, Dep't of Natural Res.*, 971 P.2d 1034, 1039 (Alaska 1999) (recognizing that certain state statutes govern rights in mineral deposits on state lands and "[b]ecause the relevant state statute clearly

(continued...)

But in order to be "free and open to exploration and purchase," the mineral or mineral deposit in question must be subject to "location."[3]  The Common Varieties Act, passed in 1955, limits what minerals are locatable, providing that "[n]o deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit."[4]  However, the Common Varieties Act does not bar location of either (1) claims "based upon discovery of *some other mineral* occurring in or in association with [a common] deposit,"[5] or (2) deposits with a "distinct and special value."[6]  M&M refers to these exceptions as the "constituent minerals" theory and the "uncommon variety" theory.

In its Plan of Operations M&M asserted that the Flag Hill rock was locatable because it either was (1) comprised of valuable minerals due to the interlocking structure of its constituent minerals, augite and plagioclase, or (2) an uncommon variety of stone with a distinct and special value.  M&M retained Terry S. Maley, a noted geologist formerly employed by the Bureau of Land Management, and Tom Bundtzen,

---

[2](...continued)
addresses the subject of abandonment of state claims, we need not construe our statute in accordance with the 'usages and interpretations' applicable to the federal mining laws").  The parties agree that federal law controls here and we concur.

[3]	*See United States v. Bienick*, 14 IBLA 290, 293 (1974) ("Not all materials which can be removed from the earth and sold at a profit are locatable under the mining laws."); BLACK'S LAW DICTIONARY 1082 (10th ed. 2014) (defining "location" as "[t]he act of appropriating a mining claim").

[4]	30 U.S.C. § 611.

[5]	*Id.* (emphasis added).

[6]	*Id.*

President of Pacific Rim Geological Consulting, Inc., to help prepare supporting materials for submission to DNR.

DNR formed an advisory committee to investigate the locatability of the Flag Hill rock and perform a site inspection. After careful deliberation the committee recommended that DNR deny M&M's application. It concluded that the constituent minerals, augite and plagioclase, were not valuable minerals and, even if they were, M&M planned to mine Flag Hill for the host rock for use in construction; it did not plan to use the augite and plagioclase apart from the host rock. The committee also concluded that the Flag Hill rock was common variety rock under the Common Varieties Act and therefore nonlocatable. DNR sent a denial letter to M&M in July 2010.

M&M appealed and requested a hearing, which the Commissioner of DNR granted. Over the next two months the parties exchanged contentious emails: M&M argued that the hearing should be longer than originally planned and that DNR should be required to present its case first. The parties also argued over the disclosure of a "committee communications" file in the administrative record, which was being held by DNR for privilege review. The hearing officer denied most of these requests but allowed an extra hour for questioning witnesses. And the parties eventually agreed that the hearing should go forward as scheduled even without the communications file and that M&M could supplement its appeal after the file was produced.

The one-day hearing was held in January 2011. Bundtzen testified that the Flag Hill rock met the engineering specifications for riprap and railroad ballast. And he testified regarding what qualities he thought made the Flag Hill rock unique. These were mainly "[s]uperior Los Angeles abrasion loss numbers, good T13 degradations, low water absorption, very acceptable sodium sulfate soundness tests, and . . . a [high] coarse riprap potential." Maley testified that he believed the Flag Hill rock was "a very strong case" for locatability because it had a "unique combination of properties": he did not

"think [he had] seen so many properties that could do so much for engineering specs . . . in a rock for this purpose." McGlinchy testified that there would be a market for the products in Fairbanks and the surrounding area.

Witnesses for DNR testified at length regarding Flag Hill's potential yield, joint spacing, and core samples. One witness testified that Flag Hill was not unique in being able to meet the technical specifications for aggregate, ballast, and riprap; he thought "[a] lot of sites — certainly a lot of sites meet — meet the criteria." Another witness testified that "chemically this plot is similar to a number of intrusions across the Interior of Alaska, as well as elsewhere in Alaska." And the witness testified that "[m]ineralogically . . . this deposit, the quartz monzodiorite is similar in mineral composition to other rocks of that chemistry, and even the texture . . . the interlocking plagioclase and augite are common to rocks of this type." The witness noted that other nearby rock deposits have higher specific gravities and that augite and plagioclase — as occurring in the deposit — have no market value even were they to be extracted and marketed.

A month after the hearing DNR produced the contents of the communications file. These were mainly emails between the committee members regarding transportation to Flag Hill, scheduling, and drafts of the committee report. M&M supplemented its appeal with a brief statement, arguing that the new materials were so important that it would have conducted its appeal differently had they been released before the hearing. As relevant, M&M argued that DNR knew some of the other mineral deposits in the area could not meet the engineering specifications for the Alaska Railroad project.

The hearing officer transmitted his report and recommendation to the Commissioner in June 2011. He concluded that the Flag Hill rock was not locatable for its high concentration of augite and plagioclase. He explained that "M&M was more

specifically arguing [the Flag Hill rock] should be deemed locatable because of the physical properties this mineralogy and texture *manifest* in the . . . rock," not the minerals themselves. (Emphasis in original.) And he noted that several of M&M's witnesses testified that M&M had no intention of extracting or using the augite and plagioclase in the rock. The hearing officer also reviewed the conflicting evidence provided by M&M and DNR and found that the favorable joint spacing argued by M&M was not supported by the evidence. The hearing officer compared the rock to other sites with similar mineralogy and found that it did not have a unique property that could give it a distinct and special value. In September 2011 the Commissioner adopted the hearing officer's ultimate conclusion that the Flag Hill rock was neither (1) valuable for its constituent minerals nor (2) unique, and he denied M&M's appeal.

M&M appealed the Commissioner's final denial to the superior court, arguing that the hearing officer had misapplied the law and denied M&M due process. The superior court affirmed. It concluded that because "[t]he application . . . [was] based on the value of the host rock, not the value of its constituent minerals," the constituent-minerals theory did not apply. The court explained that "[b]ecause [the rock] is to be used as fill, aggregate, riprap, ballast[,] and base, as a matter of law, the Flag Hill rock cannot fall within the 'uncommon variety' exception." The superior court also concluded that M&M received due process. M&M appeals.

## III.   STANDARD OF REVIEW

"In administrative appeals, we directly review the agency action in question."[7] We review questions of fact for substantial evidence, which is "such relevant

---

[7]    *Brown v. Pers. Bd. for City of Kenai*, 327 P.3d 871, 874 (Alaska 2014) (quoting *Grimmett v. Univ. of Alaska*, 303 P.3d 482, 487 (Alaska 2013)) (internal quotation marks omitted).

evidence as a reasonable mind might accept as adequate to support a conclusion."[8] "We need only determine whether such evidence exists, and do not choose between competing inferences."[9] Questions of law that involve agency expertise are reviewed for a reasonable basis.[10] Questions of law that do not involve agency expertise are reviewed under the substitution of judgment standard.[11] "Questions of due process present constitutional issues that we review de novo."[12]

M&M argues that "[t]he Hearing Officer, the Commissioner, and the superior court . . . misapplied the . . . law," and therefore we should review the entire agency decision under the substitution of judgment standard. We have held that the substitution of judgment standard is appropriate "where the case concerns 'statutory interpretation or other analysis of legal relationships about which the courts have specialized knowledge and experience.' "[13] In *City of Nome v. Catholic Bishop of Northern Alaska* we held that because "our decision require[d] interpretation of statutory and case law, we [did] not defer to the City's administrative expertise."[14] And in

---

[8]     *Id.* (quoting *Grimmett*, 303 P.3d at 487) (internal quotation marks omitted).

[9]     *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

[10]     *May v. State, Commercial Fisheries Entry Comm'n*, 175 P.3d 1211, 1215 (Alaska 2007).

[11]     *Id.*

[12]     *Brown*, 327 P.3d at 874 (quoting *Grimmett*, 303 P.3d at 487) (internal quotation marks omitted).

[13]     *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (quoting *Earth Res. Co. of Alaska v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983)).

[14]     707 P.2d 870, 876 (Alaska 1985).

*Thurston v. Guys With Tools, Ltd.*, we held that whether the agency "applied the correct legal standard" was a "question of law that [did] not involve agency expertise."[15] Thus, we will review the narrow issue of the correct application of the law under the substitution of judgment standard. But we will review the hearing officer's conclusion that the deposit at issue was not locatable for a reasonable basis.[16]

## IV. DISCUSSION

This appeal presents two issues: whether the mineral deposit at Flag Hill is "locatable" and whether M&M received procedural due process.

### A. The Hearing Officer's Decision That The Flag Hill Rock Is Not Locatable Has A Reasonable Basis.

#### 1. Legal background

Alaska generally applies federal mining law.[17] The General Mining Law of 1872, as discussed above, provides that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase."[18] A mineral deposit may be a "valuable mineral deposit" if it meets the "prudent man" test and the marketability test.[19] The prudent man test asks whether the "discovered deposits [are] of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in

---

[15]     217 P.3d 824, 827 (Alaska 2009).

[16]     *May*, 175 P.3d at 1215. This question involves considerable agency expertise. *See, e.g.*, AS 38.05.300(a) ("The commissioner shall classify for surface use land in areas *considered necessary and proper*." (emphasis added)).

[17]     *See* AS 38.05.185(a), (c).

[18]     30 U.S.C. § 22 (2012).

[19]     *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 785 (10th Cir. 2010); *see also* TERRY S. MALEY, MINERAL LAW 341, 526, 586 (6th ed. 1996).

developing a valuable mine.' "[20] The marketability test asks whether the mineral can be "extracted, removed[,] and marketed at a profit."[21]

But "[n]ot all materials which can be removed from the earth and sold at a profit are locatable under the mineral laws."[22] "It is the purpose of mineral laws to reserve from disposition and to devote to mineral sale and exploitation only such lands as possess mineral deposits of special or peculiar value in trade, commerce, manufacture, science, or the arts."[23] Thus, common minerals such as clay, peat, "common or inferior limestone," and "common rock" have not been considered "valuable minerals" under 30 U.S.C. § 22,[24] with one exception: before 1955, materials that met engineering specifications for "road beds, railroads, airport runways, foundations for large buildings, bridges[,] and other structures" were sometimes considered valuable minerals.[25]

After the Common Varieties Act of 1955, "[n]o deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood [may] be deemed a valuable mineral deposit within the meaning of the mining laws of the United States."[26] Even if the deposit previously was "subject to location because it met engineering requirements for compaction, hardness, soundness, stability, favorable

---

[20]   *United States v. Coleman*, 390 U.S. 599, 602 (1968) (quoting *Castle v. Womble*, 19 Pub. Lands Dec. 455, 457 (1894)).

[21]   *Id.* at 600 (internal quotation marks omitted).

[22]   *United States v. Bienick*, 14 IBLA 290, 293 (1974).

[23]   *Id.* at 297-98 (Stuebing, member, concurring).

[24]   *Id.* at 297 (collecting cases).

[25]   *Id.* at 298 (citing *United States v. Mattey*, 67 Interior Dec. 63 (1960); *Stephen E. Day, Jr.*, 50 Pub. Lands Dec. 489 (1924)).

[26]   30 U.S.C. § 611 (2012).

gradation, non-reactivity and non-hydrophillic qualities in road building and similar work," after the Common Varieties Act "these materials were treated as common varieties, and therefore [were] not locatable, because materials which meet these standards are common, abundant[,] and of widespread occurrence."[27]  Thus, even if common variety stone was considered locatable before 1955 because it met engineering specifications, after the Common Varieties Act it no longer was locatable.[28]

But the Common Varieties Act does not apply to bar location of either (1) claims "based upon discovery of *some other mineral* occurring in or in association with [a common] deposit,"[29] or (2) deposits with a "distinct and special value."[30]  M&M argues that Flag Hill rock is locatable under both theories.  M&M also argues that the hearing officer misapplied the law.

### 2. The "constituent minerals" theory does not apply because M&M plans to mine Flag Hill for the rock as a totality.

M&M argues that the Flag Hill rock is not subject to the Common Varieties Act because the minerals augite and plagioclase are "valuable constituent minerals."  M&M makes this argument even though it admittedly plans to use the host rock as a whole.  The hearing officer concluded that the constituent-minerals exception did not apply because the rock's value to M&M is in the rock, not the constituent minerals, augite and plagioclase.  He also agreed with the committee that augite and plagioclase "have little or no market value" even were they to be considered valuable constituent minerals.

---

[27]  *Bienick*, 14 IBLA at 298 (Stuebing, member, concurring).

[28]  *Id.*.

[29]  30 U.S.C. § 611 (emphasis added).

[30]  *Id.*

-10-                                                                                    **7028**

"If the material is located *only* for the value of a constituent element of the sand, gravel, or stone," the Common Varieties Act does not apply, and the material is locatable.[31] Even M&M's expert, Terry S. Maley, agrees with this proposition. Maley's treatise explains, "In general, if the rock is valuable for only an individual mineral or element such as gold, silver, feldspar, mica, etc. it is not a common variety question and 30 U.S.C. 611 does not apply; however, if the entire rock is used and the constituent elements or minerals are relatively unimportant, then 30 U.S.C. 611 may apply."[32]

In *United States v. Bunkowski* the claimants sought location based on gypsite to be used as a soil conditioner.[33] The Interior Board of Land Appeals (the Board) held that "[s]ince the material here is valued and used only for its constituent gypsum, it may not be necessary to determine whether the deposit is an uncommon variety of sand, gravel[,] or stone."[34] But in *United States v. Beal* the Board held that rock containing feldspar, an otherwise valuable constituent mineral, constituted common variety stone when the rock was used for ornamental or landscaping purposes.[35] Maley's treatise identifies the controlling language from *Beal* as stating, "For its use as

---

[31] *United States v. Bunkowski*, 5 IBLA 102, 113 (1972) (emphasis added) (citing *United States v. Pierce*, 75 Interior Dec. 270, 279 (1968)); *Pierce*, 75 Interior Dec. at 279 ("[I]n determining whether a particular material falls within the purview of the common varieties provision, it is necessary to determine whether the material as a totality has value or whether only a constituent element of the material has value.").

[32] MALEY, *supra* note 19, at 592.

[33] 5 IBLA at 106-07. Gypsite can be spread on alkali soils in order to improve crop yield by changing the composition of the soil through a chemical reaction. *Id.* at 107, 114-15.

[34] *Id.* at 113.

[35] 23 IBLA 378, 395 (1976).

landscaping or building stone, the feldspar on the subject claim . . . is simply ground into rock form and the feldspar element in the final product is of no significance."[36] A classic example is granitic rock composed of quartz and other minerals usually found in granite. If the granite is used for construction purposes, then "[t]here is no doubt that the rock would constitute a 'stone' within the meaning of the common varieties provision."[37] But if the same rock contained gold and the miner intended to only mine the rock for the gold, then the deposit would not be a "stone" and would not be subject to the Common Varieties Act.[38]

It is uncontested that M&M plans to mine Flag Hill for the host rock and use it for construction purposes. M&M's appellate brief says it best when it asks, "[W]hy would anyone want to extract the minerals and destroy the value of the rock?" This telling statement demonstrates that the Flag Hill rock is valuable to M&M for the host rock and not for the constituent minerals, augite and plagioclase. The claim is not based on "some other mineral"[39] — it is based on the host rock itself, like the example used in *Pierce* and the situation presented in *Beal*. The hearing officer's conclusion that the constituent-minerals theory does not apply has a reasonable basis.[40]

---

[36] MALEY, *supra* note 19, at 594; *see also Pierce*, 75 Interior Dec. at 279-80.

[37] *Pierce*, 75 Interior Dec. at 279-80.

[38] *Id.* at 280.

[39] 30 U.S.C. § 611 (2012).

[40] M&M argues that the hearing officer wrongly relied upon the fact that M&M did not plan to remove the augite and plagioclase. But this argument misses the point of the hearing officer's decision. The distinction made was not dependant on whether the minerals were removed from the host rock; it was a determination of what about the rock was valuable to M&M. In gypsite cases the gypsite is not removed

(continued...)

M&M also argues that the hearing officer used some terminology that is more frequently used in the test for uncommon varieties. Although M&M is correct, we believe this was because the hearing officer was also addressing the marketability and prudent man tests. Essentially, the hearing officer was asking whether, if augite and plagioclase were hypothetically the target of the mining, there would be a market for these minerals such that they would pass the prudent man and marketability tests. And he was required to use some of this type of language to set the context for the remainder of the decision. His analysis reasonably tackles the main issue — whether the Flag Hill rock is valuable to M&M as a whole or only for some constituent element of its matrix. We conclude that the hearing officer correctly applied the law.

### 3. The Flag Hill rock is not an uncommon variety rock.

M&M alternatively argues that the Flag Hill rock is not subject to the Common Varieties Act because it is an "uncommon variety" due to favorable joint spacing, high density, and because it meets engineering specifications. The Common Varieties Act provides that "[n]o deposit of *common varieties* of sand, stone, [or] gravel . . . shall be deemed a valuable mineral deposit."[41] But "[c]ommon varieties" do not include deposits that have "some property giving [them] distinct and special value."[42] In order to determine whether an otherwise common deposit has a "distinct and special value," we apply the five tests announced by *McClarty v. Secretary of the Interior*:

---

[40](...continued) because removal is not necessary for the gypsite to work as a soil conditioner. *See United States v. Bunkowski*, 5 IBLA 102, 111-12 (1972). Here, M&M plans to use the rock for construction — it is seeking to extract and sell the host rock, not the augite and plagioclase.

[41]     30 U.S.C. § 611 (emphasis added).

[42]     *Id.*

(1) there must be a comparison of the mineral deposit in question with other deposits of such minerals generally; (2) the mineral deposit in question must have a unique property; (3) the unique property must give the deposit a distinct and special value; (4) if the special value is for uses to which ordinary varieties of the mineral are put, the deposit must have some distinct and special value for such use; and (5) the distinct and special value must be reflected by the higher price which the material commands in the market place.[43]

If the mineral deposit does not have a unique physical property under test 2, then the rock is a common variety rock subject to the Common Varieties Act.[44]

### a. *McClarty* test 1: comparison to other types of such minerals generally

The hearing officer held that "[u]nder *McClarty* test 1, the *other mineral deposits* that should be compared with [the Flag Hill rock] are other sites with *similar mineralogy* (i.e., diorites, diabase, basalt, gabbro, quartz monzodiorites, etc.) that could be quarried for rock that is an aggregate of those *such minerals generally*." (Emphasis in original.) The hearing officer found that when sites with "such minerals generally as compared to the [Flag Hill rock]" were plotted together, "they all have relatively comparable physical properties." In making his comparison, the hearing officer mainly used sites M&M itself had proffered as a "reasonable comparison" in its Plan of Operations.

---

[43]    408 F.2d 907, 908 (9th Cir. 1969).

[44]    *See, e.g.*, *United States v. Smith*, 66 IBLA 182, 189 (1982).

M&M argues that the hearing officer considered the wrong types of mineral deposits and deposits that were too far away.[45] M&M argues that the hearing officer should have compared the Flag Hill stone to "run of the mill" stone and by not doing so ran the risk of comparing it to other uncommon varieties. And M&M argues that because the proposed use of the rock is construction — a "bulk use" — the hearing officer should have limited the comparisons to those deposits within 50 miles of Fairbanks.

In *United States v. Stacey & Jackson* the administrative law judge noted that "a key issue in determining whether the . . . stone is common or uncommon variety is whether the [appellants'] deposit should be compared to similar deposits of stone or common variety deposits of stone generally."[46] He concluded that the "stone should be compared to similar deposits of stone rather than common variety deposits generally,"[47] because (1) its use "falls under the category of building purposes which are typical of common variety minerals," (2) "[the stone] graywacke is commonly found in southern Alaska and worldwide," and (3) "the value of [this type of] stone depends on incidental factors like the proximity of the deposit to prospective consumers, local needs, and the

---

[45]     M&M also argues that the hearing officer should not have considered undeveloped deposits. But even the quote that M&M uses to support its point, from *United States v. Smith*, explicitly states that the comparison may be made with "active quarries and *exposed outcrops*." 66 IBLA at 189 (emphasis added). Maley's treatise is in accord. *See* MALEY, *supra* note 19, at 601 (citing *Smith*, 66 IBLA at 189).

[46]     171 IBLA 170, 177 (2007) (alteration in original) (internal quotation marks omitted).

[47]     *Id.* (internal quotation marks omitted).

like, rather than on any generally recognized value."[48]  On appeal the Board found no error in this application.[49]

We agree with the analysis from *Stacey & Jackson* and conclude that the comparison sites the hearing officer chose were reasonable.  Because the Flag Hill rock will be used as construction rock, and there was testimony that there were similar deposits in the area and throughout Alaska, the hearing officer permissibly compared it to similar deposits.[50]  Moreover, the hearing officer compared the Flag Hill rock to other deposits having the same general mineralogy — he did not specifically compare it to deposits having the same percentages of augite and plagioclase, or to deposits with only the interlocking texture that M&M argues makes the Flag Hill rock unique.  We hold that his choice of comparison sites with similar mineralogy was reasonable.

M&M also argues that the hearing officer should have considered only deposits within a 50-mile radius of Fairbanks, but this argument is unsupported by case law.  Only one case, *United States v. McCormick*, supports M&M's specific 50-mile rule.[51]  In that case the comparison was confined to 50 miles from Flagstaff, Arizona, the

---

[48]     *Id.*

[49]     *Id.* at 179.

[50]     *See Brubaker v. Morton*, 500 F.2d 200, 202-03 (9th Cir. 1974) (holding that colored roof stone was properly compared to other colored stone); *see also United States v. Dunbar Stone Co.*, 56 IBLA 61, 64-66 (1981) (comparing to other schist in the area); *cf. Alyeska Pipeline Serv. Co. v. Anderson*, 629 P.2d 512, 521 (Alaska 1981) (declining to give an instruction about uniqueness in relation to abundance because it was not proven that there were "abundant nearby deposits of similar stone throughout the area").

[51]     27 IBLA 65, 69 (1976).  M&M also cites *Anderson*, 629 P.2d at 521, but that case mainly discusses proximity and uniqueness under *McClarty* test 2, not comparison under *McClarty* test 1.  *See Anderson*,  629 P.2d at 521-22.

"center of the market area served by these several deposits."[52] The Board gave no reason for its limitation of 50 miles. As DNR notes, *McClarty* does not address the geographical range for the comparison.[53] Cases use such terminology as "throughout the area"[54] and "throughout the region."[55]

In *United States v. Heldman* a deposit in South Dakota was to be used for "decorative, landscaping[,] and precast work"[56] — bulk uses like M&M plans for the Flag Hill rock. Despite the uses being bulk, the Board discussed similar deposits as far away as Colorado.[57] This directly counters M&M's argument regarding haulage distance. And in *United States v. Smith* the Board noted that "there was a comparison of appellants' material with other deposits in the area."[58] The Board then mainly compared the deposit — located on the northeast side of the Kenai Peninsula — to others on the Kenai Peninsula and in the Chugach mountain range.[59] Here, the hearing officer mainly used the sites that M&M itself proffered. We conclude that the hearing officer's decision not to adopt M&M's 50-mile limit had a reasonable basis.

---

[52]    *McCormick*, 27 IBLA at 69.

[53]    *See McClarty v. Sec'y of Interior*, 408 F.2d 907, 908-10 (9th Cir. 1969) (providing no guidance on the distance to be considered).

[54]    *See United States v. Heden*, 19 IBLA 326, 339 (1975); *see also United States v. Smith*, 66 IBLA 182, 185 (1982).

[55]    *See Pitkin Iron Corp. v. Kempthorne*, 554 F. Supp. 2d 1208, 1214 (D. Colo. 2008).

[56]    14 IBLA 1, 7 (1973).

[57]    *Id.* at 6.

[58]    66 IBLA at 185.

[59]    *See id.* at 185-89.

### b. *McClarty* test 2: "unique property"

M&M argues that the Flag Hill rock is unique because of "higher specific gravity," "the fine grained uniform distribution of augite and feldspar grains," and "[f]avorable [j]oint and [f]racture [d]ensity."[60] The hearing officer concluded that these qualities did not make the rock unique. He noted that "high percentages of augite and plagioclase and ophitic texture are not unique in [this type of rock]." And he found that "there does appear to be a number of other occurrences of this mineralogy identified by geologic mapping within interior Alaska." He also found M&M's claims of high yield due to favorable joint density unsupported by the evidence.

The hearing officer's findings are supported by substantial evidence. There was testimony during the hearing that the alleged "unique" properties of the Flag Hill

---

[60] M&M also argues that the rock is unique because of its location and because it meets engineering specifications. Although M&M urges us to consider proximity to market in making the rock unique, this is an inappropriate consideration. The Board has repeatedly held that " 'extrinsic' factors such as access to highway[s] and proximity to market, although they may give a deposit a competitive edge in the marketplace, do not qualify as unique properties of the deposit which give the deposit a distinct and special value. Rather, the distinct and special value must be inherent in the unique quality of the deposit itself." *United States v. Henri*, 104 IBLA 93, 98-99 (1988) (quoting *Smith*, 66 IBLA at 188) (internal quotation marks omitted). The Flag Hill deposit cannot be unique because of its location or because it meets engineering specifications; rather, the deposit must be unique because of its particle size or some other physical feature. *See United States v. Multiple Use, Inc.*, 120 IBLA 63, 90-91 (1991) ("If pumice meets the ASTM standard for use as a lightweight aggregate, that fact does no more than establish the ability to market and use it as an aggregate."); *United States v. Guzman*, 18 IBLA 109, 125 (1974) ("[T]he Department has consistently held that deposits of sand and gravel suitable for all construction purposes, which may be superior to other deposits of sand and gravel found in the area because it is free of deleterious substances, and because of hardness, soundness, stability, favorable gradation, nonreactivity[,] and nonhydrophilic qualities, but which is used only for the same purposes as other widely available, but less desirable deposits of sand and gravel are, nonetheless, a common variety of sand and gravel.").

rock were common in rocks with that type of mineralogical quality generally, that "chemically this plot is similar to a number of intrusions across the Interior of Alaska, as well as elsewhere in Alaska." And there was testimony that "[m]ineralogically . . . this deposit, the quartz monzodiorite is similar in mineral composition to other rocks of that chemistry, and even the texture . . . [is] common to rocks of this type." One witness noted that other nearby rock deposits had higher specific gravities. And a witness from the Alaska Department of Transportation testified that Flag Hill was not unique in being able to meet the technical specifications for aggregate, ballast, and riprap and that "certainly a lot of sites meet . . . the criteria." There was also considerable testimony regarding the joint spacing of the rock, with numerous DNR witnesses testifying that M&M's forecasts for yields and joint spacing were unreasonable.

Given this evidence, we conclude the hearing officer's decision that the Flag Hill rock did not have a "unique physical quality" under *McClarty* 2 is reasonable. Only one case has found that construction rock has a unique physical property[61] and that case is considered an outlier.[62] In that case, *United States v. McCormick*, the unique physical property that was alleged was that "[t]he stone ha[d] been crushed by the forces of nature in such a way that 80 to 95 percent is of the proper size for various uses in road construction and paving projects."[63] The deposit was also "roughly stratified and naturally sorted to an extent that does not exist on any other material sources in the

---

[61]   *See United States v. McCormick*, 27 IBLA 65, 69 (1976).

[62]   *See* MALEY, *supra* note 19, at 614-16.

[63]   *McCormick*, 27 IBLA at 68.

area."[64] The Board concluded without explanation that "the subject deposit is possessed of the requisite 'distinct and special properties.' "[65]

Unique properties are found more commonly, although still without regularity, in building-stone cases where the physical properties of the rock are such that it can be palletized and shipped with no extra effort. In *United States v. McClarty* the Board found that a deposit of building stone had unique properties because it had "natural fracturing and flat surface cross sectioning" that made almost no additional work necessary during removal.[66] No blasting was required and little sorting was necessary; the rock could just be pried out, "palletized[,] and shipped without further processing."[67] A contractor testified that he had saved 12 days' labor by laying it instead of other varieties because it was so easy to work with.[68] In *United States v. Pope* the Board found that another deposit of building stone was unique for almost the same reasons as in *McClarty*: "There's no preparation necessary; it's merely loaded on the truck and taken to the site, the landscape site or the building site, as it were, and used exactly as it comes from the quarry, no blasting, no barring loose is necessary."[69] In both of these cases the stone was so unique that it essentially required no effort to mine.

---

[64]    *Id.*

[65]    *Id.* (quoting 43 C.F.R. 3711.1(b) (1975) (removed in 2003)). 43 CFR 3711.1(b), a former Bureau of Land Management regulation, excepted minerals that were "commercially valuable for use in a manufacturing, industrial, or processing operation."

[66]    17 IBLA 20, 32-33 (1974).

[67]    *Id.*

[68]    *Id.* at 37.

[69]    25 IBLA 199, 204-05, 207 (1976).

The Flag Hill rock meets engineering specifications, and from the testimony at trial it appears that the rock would have been very suitable for the Alaska Railroad project. But merely being very good rock does not make a rock unique.[70] Unlike *McCormick* or *McClarty*, here there was no quality that clearly set the rock apart from other very good rock that also met engineering specifications. We conclude there is a reasonable basis for the hearing officer's ruling that the Flag Hill rock does not have a unique physical property. Because we agree with the hearing officer on this point, we need not address the remaining three *McClarty* tests.[71] The Flag Hill mineral deposit is common variety stone subject to the Common Varieties Act and therefore not subject to location.

## B.    M&M Received Due Process.

M&M argues that its due process rights were violated because the hearing was not long enough, one of its experts was unable to testify on the application of federal mineral law, and it did not receive DNR's communications file until after the hearing.[72]

---

[70]    *See United States v. Dunbar Stone Co.*, 56 IBLA 61, 65 (1981) ("But simply because this may be uncommonly good schist does not necessarily make it uncommonly good stone." (emphasis removed)).

[71]    If the stone does not have a unique property, then it cannot have a distinct and special value that flows from its uniqueness. *See United States v. Verdugo & Miller, Inc.*, 37 IBLA 277, 303 (1978) ("[T]he stone is not unique and therefore does not have a distinct and special value."); *see also United States v. Fisher*, 115 IBLA 277, 286 (1990) (assuming arguendo a unique quality); *United States v. Thomas*, 90 IBLA 255, 262 (1986) ("Even if we accept that the particular color of the stone is unique, appellees have presented no evidence that by virtue of its color red sandstone would command a higher price in the market."); *United States v. Smith*, 66 IBLA 182, 188-89 (1982) (finding no unique quality).

[72]    M&M also argues that it was denied due process because "DNR refus[ed] to follow Federal Mining Law, which requires DNR to bear the burden to establish
(continued...)

The threshold question is whether the denial of M&M's application triggers due process protections. Due process rights do "not automatically attach to every governmental action without consideration of what rights are at stake and how they might be affected."[73] Before proceeding, we must determine "whether there is a deprivation of an individual interest of sufficient importance to warrant constitutional protection."[74] We conclude that the denial of an application to develop a minerals lease triggers due process protections because the situation is sufficiently analogous to the denial of a permit.[75] While the Department did not terminate M&M's underlying minerals lease,[76] M&M argues that the only purpose of the minerals lease was to mine

_____

[72](...continued)
prima facie the invalidity of the claim." M&M argues that DNR should have been required to proceed first at the hearing. But federal mining law applies only "[u]nless otherwise provided" and "as supplemented by state law." *See* AS 38.05.185(c). State law provides guidance on "administrative appeals . . . of a decision in an administrative appeal to the commissioner of natural resources." AS 44.37.011(a). Specifically for DNR, in hearings in cases where "facts must be resolved" 11 Alaska Administrative Code 02.050 applies. These provisions do not mandate that DNR proceed first.

[73]     *Gottstein v. State, Dep't of Natural Res.*, 223 P.3d 609, 622 (Alaska 2010).

[74]     *Heitz v. State, Dep't of Health & Soc. Servs.*, 215 P.3d 302, 305 (Alaska 2009) (quoting *Bostic v. State, Dep't of Revenue, Child Support Enforcement Div.*, 968 P.2d 564, 568 (Alaska 1998)) (internal quotation marks omitted).

[75]     *Cf. Estate of Miner v. State, Commercial Fisheries Entry Comm'n*, 635 P.2d 827, 832 (Alaska 1981) (property interest in an entry permit for drift-net salmon fishing in Bristol Bay).

[76]     *See White v. State, Dep't of Natural Res.*, 984 P.2d 1122, 1126 (Alaska 1999) (holding that the cancellation of a mining lease implicates due process); *but see State, Dep't of Natural Res. v. Universal Educ. Soc'y, Inc.*, 583 P.2d 806, 809-10 (Alaska 1978) (denial of application for a mining lease is not a property interest sufficient to
(continued...)

the stone at issue, so finding the stone is not locatable has the same effect.  We agree with M&M.

"[D]ue process requires notice and an opportunity to be heard prior to governmental deprivation or infringement of valuable property rights."[77]  To determine whether due process was provided, we consider "(1) the private interest that the official action affects; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards"; and finally "(3) the government's interest, including fiscal and administrative burdens, in implementing additional safeguards."[78]  The "crux of due process is [the] opportunity to be heard and the right to adequately represent one's interests."[79]

DNR provided M&M with notice of the hearing and responded to its various contentions in the months before the hearing.  The hearing officer added extra time to examine witnesses when M&M objected, and the parties were able to submit written materials to the hearing officer before and after the hearing.  Each side was able to present evidence and cross-examine the opposing side's witnesses. The administrative

---

[76](...continued)
trigger due process protections).

[77]     *Gottstein*, 223 P.3d at 622.

[78]     *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1280 (Alaska 2013) (quoting *Alvarez v. State, Dep't of Admin., Div. of Motor Vehicles*, 249 P.3d 286, 292 (Alaska 2011)) (internal quotation marks omitted).

[79]     *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 570-71 (Alaska 2006) (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192-93 (Alaska 1980)).

record alone in the case is more than 2,500 pages and fully documented M&M's factual and legal bases for its claim.

We hold that M&M received procedural due process. A one-day hearing was appropriate given the limited number of questions of fact the hearing was intended to resolve. And M&M never elaborated who else it would have called or how not calling these specific witnesses prejudiced it.[80] M&M was not denied due process by the restriction on Maley's testimony; it is undisputed that his prohibited testimony would have had no bearing on any of the factual matters in the case: M&M wanted Maley to testify about what the mining law meant.[81] But it is well established that expert witnesses are not permitted to testify on what the law is.[82] Moreover, M&M's legal position was well documented in its hundreds of pages of submissions to DNR.

---

[80]     *See Schmidt v. Beeson Plumbing & Heating, Inc.*, 869 P.2d 1170, 1180 (Alaska 1994) (discussing offer of proof).

[81]     *See Barios v. Brooks Range Supply, Inc.*, 26 P.3d 1082, 1088 (Alaska 2001) (holding that because the expert "could only offer the court an opinion on how it should rule, the superior court correctly found that is not 'an appropriate role for this witness to serve, regardless of the level of his expertise' "); *see also Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988) ("These cases demonstrate that an expert's testimony is proper . . . if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function."). M&M wanted to have its expert testify about federal mining law, and the hearing officer restricted Maley's testimony to factual issues.

[82]     *See Barios*, 26 P.3d at 1088; *see also In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826-27 (2d Cir. 1994), *overruled on other grounds by Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1029 (2d Cir. 1996); *United States v. Brodie*, 858 F.2d 492, 496-97 (9th Cir. 1988), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1037-38 (9th Cir. 1997); *Charles Reinhart Co. v. Winiemko*, 513 N.W.2d 773, 778 (Mich. 1994); *Buzz Stew, LLC v. City of North Las Vegas*, 341 P.3d 646, 651 (Nev. 2015); *France v. South Equip. Co.*, 689 S.E.2d 1, 14 (W. Va. 2010).

M&M finally complains that it did not receive the unprivileged contents of DNR's communications file before the hearing. But M&M expressly chose to proceed with the hearing before the communications file was released, and has failed to adequately demonstrate how the late release of documents prejudiced it.[83]

The administrative record clearly shows that DNR, and especially the hearing officer, did an exemplary job in conducting this appeal. M&M received ample due process, clearly evidenced by the thoughtful administrative decision, the voluminous administrative record, and M&M's ability to file supplemental briefing.

## V. CONCLUSION

We AFFIRM the superior court's decision affirming the Commissioner's decision denying M&M's Plan of Operations. We also AFFIRM the superior court's conclusion that M&M received due process in the administrative proceedings.

---

[83] M&M mainly argues that Flag Hill was the only source in the area to meet the Alaska Railroad specifications and that the DNR knew this. But even were both of these allegations to be true, it would not have impacted the case. The uniqueness of the Flag Hill rock had to be demonstrated without regard to location. *See United States v. Henri*, 104 IBLA 93, 98-99 (1988). Even had Flag Hill been the only usable rock, this would not have given it a "distinct and special value."